**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ALEKSANDR NIKOLAEVICH KASHIN,
         *Plaintiff-Appellee,*

and

UNITED STATES OF AMERICA,
         *Defendant-Appellee,*

v.

DOUGLAS BARRY KENT,
         *Defendant-Appellant.*

No. 04-56703

D.C. No.
CV-02-02495-
LAB/WMC

OPINION

Appeal from the United States District Court
for the Southern District of California
Larry A. Burns, District Judge, Presiding

Argued and Submitted
June 7, 2006—Pasadena, California

Filed August 10, 2006

Before: Stephen Reinhardt, Stephen S. Trott, and
Kim McLane Wardlaw, Circuit Judges.

Opinion by Judge Trott

9275

## COUNSEL

J. Michael Hannon, Thompson O'Donnell, LLP, Washington, D.C., for the defendant-appellant.

Dana J. Martin, United States Attorney and United States Department of Justice, Washington, D.C., for the defendant-appellee.

Sharon L. Papp, General Counsel American Foreign Service Association, Washington, D.C., for Amicus Curiae American Foreign Service Association.

## OPINION

TROTT, Circuit Judge:

Appellant, Douglas Barry Kent, is a senior foreign service officer seeking to avoid exposure to personal liability for an automobile accident that occurred in Russia while he was driving home from work in his personal vehicle. Kent sought certification from the Department of Justice that he was acting

within the scope of employment at the time of the accident, which, if granted, would substitute the United States for Kent as the defendant in the action. The Department of Justice refused to grant the certification. Kent also petitioned the district court for certification. The district court, applying the Restatement (Second) of Agency, concluded that Kent was not acting within the scope of employment, and denied Kent's petition for certification.

We have jurisdiction pursuant to 28 U.S.C. § 1291, and we reverse. We conclude in this interlocutory appeal that District of Columbia law governs the question of whether Kent was acting within the scope of employment. Applying District of Columbia law, we hold that Kent was acting within the scope of employment when he was involved in the automobile accident. We therefore grant Kent's petition for certification.

## I

In October 1998, Kent served as the Consul General of the United States to the Republic of Russia in the Far East Consular District—the largest consular district in Russia. As the Consul General, Kent was the highest ranking United States representative in that district. He was fully accredited as a diplomat and entitled to the fullest extent of consular immunity, including immunity from criminal prosecution.

The United States Department of State leased an apartment for Kent and provided him with a private driver and vehicle that Kent could use for any purpose, whether work or personal. When Kent first arrived in Russia, he used the private driver for all transportation. However, the budget and fiscal officer at the Moscow Embassy informed Kent that the Department of State wished to reduce the expenses of its missions overseas and indicated that the overtime expenses for Kent's personal driver were high due to Kent's late hours at work. Complying with the request that he reduce expenses, Kent had his personal vehicle shipped to Russia. The Depart-

ment of State agreed to reimburse Kent for all mileage that he
drove in his personal vehicle. *See* 14 Foreign Affairs Manual
(FAM) § 418.10 (formerly 6 FAM § 228.10).

Days after Kent's vehicle arrived in Russia, Kent was
involved in an automobile accident. Driving home from work
late one evening, Kent stopped at a gym located on his way
home. After leaving the gym, Kent pulled out in front of
another vehicle, which had just picked up a hitchhiker—
Plaintiff, Aleksandr Nikolaevich Kashin. The two vehicles
collided, sending the vehicle in which Kashin was riding
crashing into a third vehicle. Kashin was seriously injured by
the impact with the third vehicle.

Immediately after the accident, the Department of State dis-
patched its duty officer to the accident scene. Pursuant to
orders from the senior regional security officer at the United
States Embassy in Moscow, the duty officer instructed Kent
not to submit to a blood alcohol test on the ground of his dip-
lomatic status—the Department of State prohibits foreign ser-
vice officers from being injected with a needle by a foreign
official. The morning after the accident, the Consulate's
regional security officer conducted an investigation of the
accident, and the Consulate later hired a local attorney to
resolve the dispute between Kashin and Kent.

The local attorney did not resolve the dispute in Russia.
Kent attributes that failure to international politics:

> [P]olitical forces in Russia launched a campaign to
> use the accident as an opportunity to discredit the
> United States. False allegations that I was intoxi-
> cated and that I laughingly escaped the scene of the
> accident to a nearby nightclub were promulgated in
> both the local and official press. The matter, thus
> fraudulently characterized, allegedly was presented
> to the Russian Duma which purportedly passed a

> Resolution condemning the United States for the manner in which it was handling the matter.
>
> In an orchestrated political action, including staged "rallies" by "citizens" portending outrage at the United States, comparisons were made between me and a Georgian diplomat who had collided with a family in the District of Columbia while driving drunk, killing one member of the family. The Georgian diplomat was stripped of his diplomatic immunity at the request of the United States and was criminally prosecuted in Washington, D.C. The Russian protesters and press were proclaiming the "hypocrisy" of the United States in the Kashin matter, all borne of a longstanding unhappiness with how the United States had treated the Georgian diplomat.

After the Russian dispute resolution process failed, Kashin filed a lawsuit against Kent, the United States, and the Department of State in the United States District Court for the Eastern District of Pennsylvania. The district court dismissed the United States and the Department of State, concluding that sovereign immunity insulated them from suit. This dismissal left Kent as the sole defendant. The district court then transferred the action to the Eastern District of Virginia due to a lack of venue in Pennsylvania. The Eastern District of Virginia transferred the action to the Southern District of California, Kent's state of domicile.

On January 5, 2004, Kent filed a petition for certification in the Southern District of California. A month later, Kent sought from the Department of Justice certification that he was acting within the scope of employment at the time of the accident. The Department of Justice denied the certification request on March 8, 2004.

On August 26, 2004, the district court also denied Kent's petition for certification. Although Kent argued that the dis-

trict court should apply the respondeat superior law of California—Kent's state of domicile—the district court applied instead the general United States tort laws as embodied in the Restatement (Second) of Agency. Applying this law, the district court determined that Kent was not acting within the scope of employment at the time of the accident. It also denied Kent's request for an evidentiary hearing.

Kent appeals the district court's rulings.

## II

"The Attorney General's decision regarding scope of employment certification is subject to *de novo* review in both the district court and on appeal. Where facts relevant to this inquiry are in dispute, however, we review the district court's factual findings for clear error." *Green v. Hall*, 8 F.3d 695, 698 (9th Cir. 1993) (per curiam) (citation omitted). "[T]he party seeking review bears the burden of presenting evidence and disproving the Attorney General's decision to grant or deny scope of employment certification by a preponderance of the evidence." *Id.*

## III

We are presented with a single question: Was Kent acting within the scope of employment when the automobile accident occurred? Because the Federal Tort Claims Act (FTCA) is silent on what law to apply when the tort occurs in a foreign country, and no federal court in the United States has addressed that issue, we must first determine what law to apply.

Before proceeding to the choice of law issue, we note that it is unusual that the United States government is the party opposing Kent's petition for certification at the district court and now on appeal, rather than Kashin, the plaintiff. As the

Supreme Court aptly noted in a similar case where the tort occurred in a foreign country,

> The federal employee's claim is one the United States Attorney has no incentive to oppose . . . : Win or lose, the United States retains its immunity; hence, were the United States to litigate "scope of employment" against its own employee—thereby consuming the local United States Attorney's precious litigation resources—it would be litigating solely for the benefit of the plaintiff.

*Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 428 (1995). Accordingly, win or lose, the government faces no liability in this action. We can, however, comprehend that the government may in some circumstances, possibly as a matter of relations with foreign sovereigns or their citizens, wish to enforce its view that its officers or employees should not escape responsibility for particular tortious conduct committed abroad. The United States's reasons for participating in this case are unknown to us. They are also irrelevant.

## IV

### A

[1] The FTCA permits suits against the United States for injuries caused within a government employee's scope of employment. *See* 28 U.S.C. § 1346(b)(1). The Westfall Act amended the FTCA to provide that if the Attorney General certifies that a federal government employee was acting within the scope of employment when the tort occurred, then the United States shall be substituted as the defendant in a tort suit against the employee. 28 U.S.C. § 2679(d). Upon certification, the government employee is dismissed from the suit, and is immune from other civil actions arising from the alleged tort. 28 U.S.C. § 2679(b)(1). If the Attorney General refuses to certify, the employee may petition the district court

to certify that he was acting within the scope of employment. 28 U.S.C. § 2679(d)(3). Either party may immediately appeal the district court's decision. *See Pelletier v. Fed. Home Loan Bank of San Francisco*, 968 F.2d 865, 873 (9th Cir. 1992).

**[2]** The FTCA, however, does not waive the sovereign immunity of the United States if the tort was committed in a foreign country. 28 U.S.C. § 2680(k). Where, as here, the tort was committed abroad, the scope of employment analysis remains the same, and, if the Department of Justice or the court certifies that the employee was acting within the scope of employment, the United States is substituted as the defendant. However, because the United States retains its sovereign immunity, the action will be dismissed. Thus, a grant of certification sounds the death knell for lawsuits involving foreign torts.

**[3]** Accordingly, the lynchpin question in FTCA cases is whether the employee was acting within the scope of employment at the time of the allegedly tortious act. The law applicable to determine whether a government employee was acting within the scope of employment is "the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). This law is generally the respondeat superior law of the state in which the alleged tort occurred. *See Green*, 8 F.3d at 698-99. However, Congress expressed its intent that foreign law not apply. *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 707 (2004). Thus, where the alleged tort occurred in a foreign country, the threshold question is what law to apply.

**B**

Kent argues that we should apply the law from the defendant's state of domicile, California in this case. The district court rejected that argument and applied instead the Restatement (Second) of Agency. We disagree with both Kent and the district court and apply instead District of Columbia law.

Our decision to apply District of Columbia law relies partially upon the Department of State's location in the District of Columbia and partially upon a process of elimination.

[4] Kent's employer, the Department of State, is located within the District of Columbia. The Department of State's foreign actions are "inextricably bound up with the District of Columbia in its role as the nation's capital." *Rasul v. Rumsfeld*, 414 F. Supp. 2d 26, 32 (D.D.C. 2006) (internal quotation marks omitted) (applying District of Columbia respondeat superior law under the FTCA in a lawsuit filed against the Secretary of Defense and a number of high-ranking members of the armed forces where the alleged torts occurred on Guantanamo Bay Naval Base). For example, the decision to send Kent to Russia and the decision to reduce the expenses of overseas missions, leading to Kent's use of his personal vehicle, were most likely made in the District of Columbia—thereby establishing a nexus, albeit tenuous, to the tort that occurred in Russia.

[5] We decline to adopt the district court's rationale underlying its decision to apply the Restatement (Second) of Agency. Recognizing that the FTCA is silent on what law to apply, the district court looked to the Military Claims Act, which has a choice of law provision similar to that of the FTCA. *See Kashin v. Kent*, 333 F. Supp. 2d 926, 929-30 (S.D. Cal. 2004). Both statutes are silent on what law to apply if the alleged tort occurred in a foreign country. However, the regulations promulgated under the Military Claims Act provide, "In claims arising in a foreign country, liability of the United States will be assessed by reference to general principles of tort law common to the majority of United States jurisdictions." 32 C.F.R. § 536.28(b). The district court concluded, "In the absence of clear precedent regarding choice of law in FTCA cases where the act or omission occurred abroad, the Court looks to the choice of law regulations promulgated pursuant to the MCA." *Kashin*, 333 F. Supp. 2d at 930. Accordingly, the district court found "that the Restatement (Second)

of Agency is a standard legal publication containing general tort principles of the United States." *Id.*

We conclude that the regulations enacted under the Military Claims Act carry no weight as to Congress's intent concerning the FTCA. The Military Claims Act regulations were promulgated by the Secretaries of Army and Air Force to fill in the blank left by Congress. *See* 32 C.F.R. §§ 536.28(b), 842.51(a)(1). The regulations therefore express the intent of the Secretaries and, consequently, provide no insight as to the intentions of Congress concerning the FTCA.

Moreover, District of Columbia law has one substantial advantage over applying the Restatement in general—it provides a single, cogent body of law rather than multiple state and federal decisions that grant sometimes conflicting interpretations to the Restatement. By looking to a single forum's interpretation of the scope of employment, we add legitimacy to the process of determining whether an employee was acting within the scope of employment; otherwise, courts would have carte blanche to pick and choose among various conflicting cases from multiple forums.

Applying District of Columbia law also has a substantial advantage over Kent's suggestion of applying law from the defendant's state of domicile—consistency. If we applied the respondeat superior law from the defendant's state of domicile, a lawsuit arising from a single tortious act but implicating multiple tortfeasors could arrive at conflicting results, based upon each tortfeasor's state of domicile. On a close factual scenario, those tortfeasors domiciled in a state with a broad interpretation of scope of employment would be protected from personal liability while those tortfeasors domiciled in states with a narrow interpretation of scope of employment would be saddled with personal liability, even though they were involved in the same tortious incident as their co-tortfeasors.

**[6]** Therefore, until Congress provides further guidance, we conclude that District of Columbia law governs the question of whether Kent was acting within the scope of employment.

## V

The government contends that Kent was not acting within the scope of employment at the time of the accident. It argues that Kent's allegedly tortious conduct did not involve an activity that Kent was hired to perform—neither driving nor exercising at the gym was part of Kent's duties as the Consul General. The government therefore contends that the district court properly denied Kent's petition for certification. We disagree.

## A

**[7]** District of Columbia law concerning the scope of employment is rooted in the Restatement (Second) of Agency. *See Schecter v. Merchs. Home Delivery, Inc.*, 892 A.2d 415, 427-28 (D.C. 2006). Restatement § 228 states that an employee's conduct is within the scope of employment if "(a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; [and] (c) it is actuated, at least in part, by a purpose to serve the master." "District of Columbia law . . . liberally construes the doctrine of respondeat superior, at least with respect to the first prong of the Restatement. . . ." *Stokes v. Cross*, 327 F.3d 1210, 1216 (D.C. Cir. 2003).

**[8]** Although "the determination of scope of employment is dependent upon the facts and circumstances of each case," *Penn Cent. Transp. Co. v. Reddick*, 398 A.2d 27, 29 (D.C. 1979), the District of Columbia Court of Appeal has announced a general rule:

> [W]hatever is done by the employee in virtue of his employment and in furtherance of its ends is deemed

by the law to be an act done within the scope of his
employment, and . . . in determining whether the ser-
vant's conduct was within the scope of his employ-
ment, it is proper to inquire whether he was at the
time engaged in serving his master.

*Id.* (citation omitted). Several factors are indicative of whether
an employee's conduct falls within the scope of employment.
*District of Columbia v. Davis*, 386 A.2d 1195, 1203 (D.C.
1978). The court evaluates "whether the employer at the time
had the right to control and direct the employee in the perfor-
mance of his work." *Id.* The court evaluates also "the employ-
ee's state of mind" to determine whether the employee
subjectively believed that he was acting within the scope of
employment. *Id.*

Although no reported District of Columbia case has a fac-
tual scenario involving a senior foreign service officer com-
mitting a tort abroad, we conclude that our decision is
governed by the principles announced in *District of Columbia
v. Davis*, 386 A.2d 1195 (D.C. 1978). In *Davis*, the Court of
Appeal was presented with the question of whether a police
officer was acting within the scope of employment when he
accidently discharged his service revolver. *Id.* at 1198-99. The
officer was off duty at the time of the accident and had not
been on active duty that day. *Id.* at 1201. He was preparing
to take a shower at a private apartment, and, as he unholstered
the revolver, it fired, injuring another individual in the apart-
ment. *Id.*

Based upon these facts, the Court of Appeal concluded that
the officer was acting within the scope of employment. *Id.* at
1205. The Court of Appeal focused primarily on police
department regulations governing the officer's conduct. *Id.* at
1202. The regulations state,

> 2:1:4 Members of the force are held to be always on
> duty, although periodically relieved from the routine

performance of it; are always subject to orders from the proper authorities and to call from citizens; and the fact that they may be technically off duty shall not be held as relieving them from the responsibility of taking proper police action in any matter coming to their attention requiring such action.

2:3:1 Members of the force, when off duty any place in the District of Columbia, except in their residences, shall carry their badges, identification cards and service revolvers at all times.

2:3:2 When off duty and not in full uniform, members of the force shall wear their service revolvers in such a manner as to conceal them from view.

*Id.* Pursuant to these regulations, the Court of Appeal found that the officer was carrying the service revolver because he was required to do so by his employer, and that, "[b]y wearing it at all times, he was furthering his employer's function of maintaining public order." *Id.* at 1203.

Additionally, the court found that the police department had the right to control the officer at the time of the accident. *Id.* The court reasoned that "[h]ad there been a disturbance in the area, there is no doubt that [the officer] could have been compelled to respond to it, in spite of the fact that he was technically off-duty." *Id.* The court also relied upon the officer's state of mind at the time of the accident, finding that the officer believed "he was, for certain purposes, effectively on duty at all times." *Id.*

Ultimately, the court held that the officer was acting within the scope of employment because, "[t]hough technically within the off-duty classification, [the officer] was engaged in the execution of a function specifically prescribed by the city —carrying a gun—and the performance of the requirement,

though negligent, was nevertheless in furtherance of the interests of the employer." *Id.* at 1204-05.

Applying those principles from *Davis*, we hold that Kent was acting within the scope of employment at the time of the automobile accident.

The Department of State considered Kent "to be on duty twenty-four hours a day, seven days a week." 14 FAM § 418.2-1 (formerly 6 FAM § 228.2-1); *see also* 3 FAM § 4376 ("Because of the uniqueness of the Foreign Service, employees are considered to be on duty 24 hours a day. . . ."). Kent, however, has even more compelling facts than the officer in *Davis* because Kent was actually engaged in an act—transportation of a consulate general—that the Foreign Affairs Manual labels as having a "business purpose": "Official vehicles may be used for the following business purposes: (1) Any transportation [of] . . . consulates general is considered business use since these officers are considered to be on duty twenty-four hours a day, seven days a week. . . ." 14 FAM § 418.2-1. Conversely, the *Davis* officer was in a private apartment preparing for a shower. *See* 386 A.2d at 1201.

Moreover, the Department of State exercises significant control over Kent, whether he is at or away from his office. The Foreign Affairs Manual limits with whom Kent may fraternize, *see* 3 FAM § 4377 #5, governs the manner in which Kent operates a vehicle, *see* 3 FAM § 4377 #20 (prohibiting "violation of traffic laws, safety regulations or instructions, or safe driving practices"), and designates how Kent must conduct himself at all times, *see* 3 FAM § 4377 #40 (prohibiting "immoral, indecent, unethical, criminal, infamous, dishonest, or notoriously disgraceful conduct"); 3 FAM § 4139.10. These regulations are not empty threats. Indeed, Kent received from the Department of State a letter of reprimand arising from his traffic accident in Russia. The letter, of which we take judicial notice, warned Kent that his security clear-

ance would be reduced or revoked if he does not "use better judgment in the future."

Kent also carried with him electronic equipment that enabled the Department of State to contact him at any time. Had there been a problem at the time Kent was driving home, the Department of State could have directed Kent to respond. In fact, Kent stated that he had been "required to attend to the business of the United States from my residence, or to leave my residence in the middle of the night on official business."

Additionally, Kent would not be in this situation if he had not acted in furtherance of the Department of State's interest. As Consul General, Kent was provided with a private vehicle and a driver to use for any transportation purpose. Kent had his personal vehicle shipped to Russia only after the Department of State specifically requested that he use his personal vehicle to reduce the overtime expenses of his private driver. Had Kent ignored the request to reduce expenses and continued to use his private driver at all times, he would face no personal liability arising from a traffic accident.

Finally, Kent's declaration demonstrates that he subjectively believed he was acting within the scope of employment at the time of the accident. Kent knew, pursuant to Department of State regulations, that he was engaged in a business purpose whenever he traveled. *See* 14 FAM § 418.2-1. Kent knew also that he was under the Department of State's control at all times, and was subject to being dispatched at any time. These facts are sufficient to demonstrate that Kent believed he was acting within the scope of employment at the time of the accident. *See Davis*, 386 A.2d at 1203 (concluding that officer's "awareness of the fact that he was, for certain purposes, effectively on duty at all times" militated in favor of concluding that the officer had acted within the scope of employment).

"[T]he ultimate question is whether or not it is just that the loss resulting from the servant's acts should be considered as

one of the normal risks to be borne by the business in which the servant is employed." Restatement (Second) of Agency § 229 cmt. a. In other words, is it just for the risk of loss from a Consul General's transportation while stationed in Russia to be borne by the Department of State? There is little doubt that the Department of State itself considered the risk of a vehicular accident caused by Kent's transportation to be a normal business risk—it hired a private driver for Kent to use for any purpose, and was therefore liable for all traffic accidents caused by Kent's transportation. The Department of State did not shift its risk of loss to Kent by requesting that he drive his personal vehicle to save the Department of State expenses.

**[9]** Therefore, because Kent was (1) engaged in a business act; (2) under the control of the Department of State; (3) acting in furtherance of the Department of State's interest; and because (4) he subjectively believed he was acting within the scope of employment, we hold that Kent was acting within the scope of employment when he was involved in the automobile accident.

**B**

Our holding is not affected by two cases that conclude, under District of Columbia law, that law enforcement agents were not acting within the scope of employment, despite a regulation stating that they were always on duty. In *District of Columbia v. Coron*, 515 A.2d 435 (D.C. 1986), the Court of Appeal held that although a police regulation states that officers are always on duty, an officer is not acting within the scope of employment when he, after consuming alcohol at a bar, intentionally physically assaults a person. *Id.* at 438. The court found two facts dispositive. First, "the very nature of [the officer's] behavior makes it irrelevant whether he was 'on duty' at the time of this incident within the meaning of the police regulations." *Id.* Second, "it is of particular importance that at no time was [the officer's] conduct in furtherance of the [employer's] interests." *Id.*

Neither of those two facts is present in Kent's situation. The government does not allege that Kent committed an intentional tort or that he engaged in reprehensible behavior; instead, the record suggests that the accident, at most, resulted from Kent's inattentive driving. Additionally, Kent was driving his personal vehicle instead of riding with his private driver to further the Department of State's interest in reducing expenses. No doubt, if Kent had placed his personal interest ahead of the Department of State's interest, then Kent would not find himself in this unenviable position.

Likewise, our decision is not affected by the District Court for the District of Columbia's opinion in *Smith v. Grimes*, 798 F. Supp. 798 (D.D.C. 1992). In *Grimes*, the district court, applying District of Columbia law, held that an agent of the Drug Enforcement Agency (DEA) was not acting within the scope of employment when he, while intoxicated, drove a DEA-provided vehicle, causing a traffic accident. *Id.* at 802. After finishing work for the day, the agent drove the DEA vehicle to the Fraternal Order of Police Lodge, where he consumed enough alcohol to become intoxicated. *Id.* at 800. After leaving the lodge, the agent's vehicle collided with another vehicle. *Id.* The agent knew that driving the DEA vehicle for personal purposes violated DEA regulations. *Id.* at 802. The court concluded that the agent did not act within the scope of employment because his conduct "did not further a work-related purpose nor was it intended to serve such a purpose." *Id.*

Again, Kent's situation is distinguishable. Not only was Kent's use of the vehicle in conformance with Department of State regulations, those regulations designated his use as a business use. *See* 14 FAM § 418.2-1. Additionally, as discussed above, Kent drove his personal vehicle to serve the Department of State's interests, not his personal motives.

## C

Our decision is consistent with decisions from other jurisdictions. In *Wilkinson v. United States*, 677 F.2d 998, 999-

1000 (4th Cir. 1982), the Fourth Circuit found that a member of the Navy was acting within the scope of employment when he struck a pedestrian with a vehicle that he was driving. The serviceman had been ordered to drive a rental car from Boston to Norfolk, Virginia, to pick up and deliver certain items associated with the ship. *Id.* at 999. The accident occurred when the serviceman had finished his work for the day and was driving back to his hotel room, intending first to stop for dinner. *Id.* The Fourth Circuit expressed little hesitation in holding that the serviceman was acting within the scope of employment, despite his being done with work for the day. *See id.*

Like the serviceman in *Wilkinson*, Kent had finished his work for the day, was returning to his government provided lodging, made a stop on the way, and was reimbursed for mileage. Thus, just as the *Wilkinson* defendant's conduct was within the scope of employment, so was Kent's conduct.

The government and the district court focused on our decision in *Clamor v. United States*, 240 F.3d 1215 (9th Cir. 2001), to support their determination that Kent was not acting within the scope of employment. In *Clamor*, the defendant was a civilian employee of the United States Navy temporarily assigned to work on a ship moored at Pearl Harbor Naval Base in Hawaii. *Id.* at 1216. No government quarters were available on-base, so the government arranged off-base commercial lodging for the defendant and provided him with a rental car for transportation. *Id.* After finishing work for the day, the defendant was driving home and, while still inside the base, rear-ended a vehicle. *Id.* We found that (1) the defendant was not working the entire time he was in Hawaii; (2) he was off duty when the accident occurred; (3) he was free to do whatever he wished while off duty; (4) the government derived no benefit from his activities once he stopped working on the ship; and (5) he was not motived by a purpose to serve the master at the time of the accident. *Id.* at 1217. We therefore held that, under Hawaii law, which follows the

Restatement, the defendant was not acting within the scope of employment. *Id.*

Kent's situation is distinguishable from *Clamor*. First, we recognized in *Clamor* that "[if the defendant] had been on call around the clock or working until his head hit the pillow, we might reach a different result." *Id.* (internal quotation marks omitted). Here, there is no dispute that Kent was "on call around the clock." *See* 14 FAM § 418.2-1. Second, unlike the employee in *Clamor*, Kent was not free to do whatever he wished after completing work. The Department of State regulates its employees' conduct even when they are not at the office, and Kent is subject to discipline if he does not conform to the Department of State's prescribed regulations. *See* 3 FAM § 4376; 3 FAM § 4139.10. Third, the government still derived a benefit from Kent once he left the office. He was one of the primary public faces for the United States in Eastern Russia—how Kent acted while within Russian society could have had a substantial impact on the Department of State. Additionally, because Kent is on duty "24/7" and must always carry with him equipment by which he can be contacted, his mere presence in Russia provided a benefit to the Department of State. *See Davis*, 386 A.2d at 1203 (finding that the officer furthered his employer's interest by wearing a service revolver at all times). Finally, unlike the defendant in *Clamor*, Kent's act of driving his personal vehicle was actuated to serve his master. Therefore, the factual scenario in *Clamor* is inapposite to Kent's situation.

## VI

**[10]** The district court properly exercised its discretion in denying Kent's request for an evidentiary hearing. While the district court has the discretion to hold an evidentiary hearing, it "should not do so if the certification, the pleadings, the affidavits, and any supporting documentary evidence do not reveal an issue of material fact." *Gutierrez de Martinez v.*

*Drug Enforcement Admin.*, 111 F.3d 1148, 1155 (4th Cir. 1997).

   **[11]** Claiming that he is a victim of political circumstance, Kent requested an evidentiary hearing to explore the government's actual motivation underlying its denial of his request for certification. Even if Kent were correct that the Attorney General was influenced by political pressure from Russia, both the district court and this court review de novo the Attorney General's decision, making the Attorney General's actual motivation irrelevant.

## CONCLUSION

   This is not a scope of employment case where the employee was off-duty, assaulted an individual in a fit of rage, or violated company policy. It is also far from the standard case involving an employee commuting in a company vehicle. Instead, this case involves a Consul General whom the Department of State assigned to work in Eastern Russia and who was on duty at all times. Although Kent could have utilized his government-provided private vehicle and driver, he chose to act in the Department of State's best interests by shipping his personal vehicle to Russia to reduce the overtime expenses incurred by his driver.

   Now that Kent has been sued in the United States, the Department of State has not only stopped fighting for a Consul General—who has served the Department of State in places such as Panama, Albania, Kosovo, Tajikistan, and Liberia—but it has joined the other team and is litigating for the benefit of the plaintiff. Although we cannot answer why the Department of State and the United States Attorney spent their precious and scarce resources opposing this petition for certification, *see Lamagno*, 515 U.S. at 428, we do answer the legal question involved. Applying District of Columbia law, we conclude that Kent was acting within the scope of employ-

ment when he was involved in the automobile accident. We therefore grant Kent's petition for certification.

**REVERSED.**