**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

SUNDUS SHAKER SALEH, on
behalf of herself and those
similarly situated,
*Plaintiff-Appellant*,

v.

GEORGE W. BUSH; RICHARD B.
CHENEY; DONALD RUMSFELD;
CONDOLEEZZA RICE; COLIN
POWELL; PAUL WOLFOWITZ;
DOES 1–10, inclusive; and the
UNITED STATES OF AMERICA,
*Defendants-Appellees.*

No. 15-15098

D.C. No.
3:13-cv-01124-JST

OPINION

Appeal from the United States District Court
for the Northern District of California
Jon S. Tigar, District Judge, Presiding

Argued and Submitted December 12, 2016
San Francisco, California

Filed February 10, 2017

Before:  Susan P. Graber and Andrew D. Hurwitz, Circuit
Judges, and Richard F. Boulware,* District Judge.

Opinion by Judge Graber

## SUMMARY**

### Westfall Act / Immunity

The panel affirmed the district court's dismissal, due to plaintiff's failure to exhaust her administrative remedies, of her action after the district court, pursuant to the Westfall Act, substituted former officials of the President George W. Bush administration for the United States as the sole defendant.

Plaintiff alleged that former officials of the President George W. Bush administration engaged in the war against Iraq in violation of the Alien Tort Statute.  The district court held that plaintiff had not exhausted her administrative remedies as required by the Federal Tort Claims Act.

The panel held that the individual defendants were entitled to official immunity under the Westfall Act, which accords federal employees immunity from common-law tort claims for acts undertaken in the course of their official

---

* The Honorable Richard F. Boulware, United States District Judge for the District of Nevada, sitting by designation.

** This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

duties. Applying the plain language of the Westfall Act and District of Columbia's *respondeat superior* law to the facts alleged in the operative complaint, the panel held that the individual defendants' alleged actions fell within the scope of their employment. The panel further held that the treaties and charters cited by plaintiff did not alter its conclusion that the Westfall Act, by its plain terms, immunized defendants from suit. Finally, the panel held that the district court did not abuse its discretion in denying plaintiff an evidentiary hearing to challenge the Attorney General's scope certification (wherein the Attorney General determined that the employees were acting within the scope of their employment and transformed the action into one against the United States).

The panel rejected plaintiff's argument that defendants could not be immune under the Westfall Act because plaintiff alleged violations of a *jus cogens* norm of international law. A *jus cogens* norm is recognized by the international community as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law. The panel held that Congress can also provide immunity for federal officers for *jus cogens* violations pursuant to the reasoning in *Siderman de Blake v. Argentina*, 965 F.2d 699 (9th Cir. 1992) (holding that Congress can provide immunity to a foreign government for its *jus cogens* violations, even when such immunity is inconsistent with principles of international law).

**COUNSEL**

Dave Inder Comar (argued), Comar Law, San Francisco, California, for Plaintiff-Appellant.

Patrick G. Nemeroff (argued) and Matthew M. Collette, Attorneys, Appellate Staff; Melinda Haag, United States Attorney; Benjamin C. Mizer, Principal Deputy Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; for Defendants-Appellees.

Jerome Paul Wallingford, San Diego, California, for Amicus Curiae Lawyers for International Law.

Rajeev E. Ananda, New York, New York, for Amicus Curiae Planethood Foundation.

**OPINION**

GRABER, Circuit Judge:

Plaintiff Sundus Shaker Saleh sues several individuals who served as high-ranking officials in the administration of President George W. Bush. Plaintiff claims that the former officials conspired to engage in, and did engage in, a war of aggression against Iraq and that, in doing so, they violated the "law of nations" within the meaning of the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350. The district court substituted the United States for the officials as the sole defendant pursuant to the Westfall Act, 28 U.S.C. § 2679(d)(1), and then dismissed the case because Plaintiff had not exhausted her administrative remedies as required by the Federal Tort Claims Act ("FTCA"). Plaintiff argues that substitution of

the United States was improper because the former officials are not entitled to official immunity.  Because we conclude that the individual defendants are entitled to official immunity under the Westfall Act and that the United States properly was substituted as the sole defendant, we affirm.

FACTUAL AND PROCEDURAL HISTORY[1]

In 2003, Kurdish Army troops forced Plaintiff and her family to leave their home in Jalawla, Iraq, and flee to Baghdad.  The troops, who were aligned with the United States, were taking part in what has become known as the Iraq War, a military action that officially began on March 19, 2003, but that, Plaintiff claims, Defendants[2] had been planning for years.  Plaintiff endured many hardships in Baghdad.  Eventually she was forced to leave Iraq and move to Jordan.  In this case, she seeks to represent "a class of persons consisting of all innocent Iraqi civilians who, through no fault of their own, suffered damage" from the Iraq War.

---

[1] We recount the facts as alleged in Plaintiff's second amended complaint.  *See McLachlan v. Bell*, 261 F.3d 908, 909 (9th Cir. 2001) (holding that, when reviewing a dismissal in the absence of an evidentiary hearing, "we accept as true the factual allegations in the complaint").

[2] The defendants are former President George W. Bush, former Vice President Richard B. Cheney, former Secretary of Defense Donald Rumsfeld, former National Security Advisor and Secretary of State Condoleezza Rice, former Secretary of State Colin Powell, former Deputy Secretary of Defense Paul Wolfowitz, 10 other former high-ranking officials in the Bush Administration, and the United States.  In this opinion, we use "Defendants" to refer only to the individual defendants, who were the named defendants below.  We refer to the United States, which was substituted as the sole defendant, as the United States.

Plaintiff claims that Defendants Cheney, Rumsfeld, and Wolfowitz began advocating for an invasion of Iraq and for the removal of Iraqi President Saddam Hussein from power as early as 1997.  In January 1998, Rumsfeld and Wolfowitz sent President Clinton a letter urging him to "implement a '*strategy for removing Saddam's regime from power*,' which included a 'willingness to *undertake military action* as diplomacy is clearly failing.'"  (Emphasis in complaint.) They sent a similar letter to Speaker of the House Newt Gingrich and Senate Majority Leader Trent Lott later that year.

Defendant Bush became President in January 2001, and appointed the other Defendants to high-ranking positions within his administration.  According to Plaintiff, Defendants almost immediately began to discuss a possible invasion and occupation of Iraq, with Defendant Rumsfeld stating at an early National Security Council meeting that "what we really want to think about is going after Saddam."  As then-Treasury Secretary Paul O'Neill later put it:

> From the start, we were building the case against Hussein and looking at how we could take him out and change Iraq into a new country.  And, if we did that, it would solve everything.  It was all about finding *a way to do it.*  That was the tone of it.  The President saying, "Fine.  Go find me a way to do this."

(Emphasis in complaint.)

According to Plaintiff, the September 11, 2001 attacks provided Defendants with a pretext to launch an invasion of Iraq.  Defendants Wolfowitz and Rumsfeld "openly pushed

for war against Iraq" on the day of the attacks, despite the lack of evidence tying Iraq to the attacks. Defendant Bush was less eager to take action without evidence of a link between Iraq and the September 11 attackers. He asked various officials to "go back over everything" to try to find evidence that Saddam Hussein had been involved with Al Qaeda. Over the course of the next year or so, Defendants began planning for the invasion of Iraq, even as they struggled to find such a link.

Beginning around August 2002, Defendants allegedly mounted a coordinated campaign to convince "the public, the Congress and the allies of the need to confront the threat from Saddam Hussein." As part of that campaign, Defendants and others "continually used fabricated intelligence from unreliable sources in order to prep the public for an invasion of Iraq." For instance, Defendant Bush claimed in his 2003 State of the Union address that Iraq had tried to "obtain large quantities of uranium from Africa," despite the fact that this claim was "unconfirmed and highly unlikely." During that time period, Defendants also continued to plan for an invasion of Iraq. According to Plaintiff, Defendants were committed to the invasion whether or not the United Nations approved of the action and whether or not United Nations inspectors uncovered evidence that Iraq was developing nuclear weapons.

On March 7, 2003, International Atomic Energy Agency Director General Mohamed ElBaradei "reported to the UN Security Council that there was no indication 'of resumed nuclear activities,' 'that Iraq has attempted to import uranium,' [or] 'that Iraq has attempted to import aluminum tubes for use in centrifuge enrichment.'" Nonetheless, less than two weeks later, the United States invaded Iraq.

Congress authorized the use of military force to "defend the national security of the United States against the continuing threat posed by Iraq." Authorization for Use of Military Force Against Iraq Resolution of 2002, Pub. L. No. 107-243, 116 Stat. 1498 ("Authorization for Use of Military Force"), but Defendants did not secure United Nations authorization for the war.

Plaintiff brought this action in 2013. She alleges that Defendants' conduct in planning and executing the Iraq War amounted to the "crime of aggression" and a conspiracy to commit the crime of aggression,[3] which she claims was a violation of the "law of nations" within the meaning of the ATS. After she filed an amended complaint in September 2013, the United States filed a certification that Defendants had been "acting within the scope of their federal office or employment at the time of the incidents [at issue] in this matter." Under 28 U.S.C. § 2679(d)(1), the United States was then substituted as the sole defendant. Thereafter, the amended complaint was dismissed because Plaintiff had failed to exhaust her administrative remedies as required by the FTCA, 28 U.S.C. § 2675(a). Plaintiff filed a second

---

[3] Like Plaintiff, we use the shorthand term "aggression" to refer to both aggression itself and conspiracy to commit aggression, both of which Defendants are alleged to have engaged in. For purposes of this case, we define aggression as the waging of unprovoked war. *See, e.g.*, Depositary Notification, Amendments to the Rome Statute of the International Criminal Court on the Crime of Aggression, Reference C.N.651.2010 (Nov. 29, 2010) (defining aggression in a similar, though more complex, way). A slightly different definition of aggression is "the use of military force as an instrument of advancing national policy." Grant M. Dawson, *Defining Substantive Crimes Within the Subject Matter Jurisdiction of the International Criminal Court: What is the Crime of Aggression?*, 19 N.Y.L. Sch. J. Int'l & Comp. L. 413, 432 (2000). Our analysis does not depend on the precise definition of aggression.

amended complaint. The United States again filed a "scope certification," and the district court again substituted the United States and dismissed the action, this time with prejudice. The district court also denied Plaintiff's motion for an evidentiary hearing to challenge the scope certification. Plaintiff timely appeals both the dismissal of the action and the denial of her motion for an evidentiary hearing.

## STANDARDS OF REVIEW

"We review the dismissal [for lack of subject matter jurisdiction] and the denial of the challenge to certification de novo. . . . We review the decision whether to conduct an evidentiary hearing for abuse of discretion." *McLachlan v. Bell*, 261 F.3d 908, 910 (9th Cir. 2001) (footnote omitted).

## DISCUSSION

The Alien Tort Statute grants "district courts . . . original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. Not every violation of the law of nations gives rise to a claim that can be brought under the ATS. Rather, "any claim based on the present-day law of nations [must] rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms" that the drafters of the ATS had in mind—"violation of safe conducts, infringement of the rights of ambassadors, and piracy." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 724–25 (2004). The set of "ATS torts"—violations of norms of international law giving rise to claims cognizable under the ATS—is, therefore, not frozen in time, but the Supreme Court has instructed us to be wary of adding to that set. *See id.* at

729 ("[T]he door to further independent judicial recognition of actionable international norms . . . is still ajar subject to vigilant doorkeeping, and thus open to a narrow class of international norms today."). Perhaps not surprisingly, only a few new ATS torts have been recognized by federal appellate courts since *Sosa* was decided. *See, e.g.*, *Doe I v. Nestle USA, Inc.*, 766 F.3d 1013, 1022 (9th Cir. 2014) (holding that a violation of the "prohibition against slavery" gives rise to a claim under the ATS); *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163, 169 (2d Cir. 2009) (concluding that a violation of the "prohibition . . . against nonconsensual human medical experimentation" is an ATS tort).

Plaintiff asks us to recognize a violation of the norm against aggression as an ATS tort. We need not decide that issue. Assuming, without deciding, that engaging in aggression constitutes an ATS tort,[4] Plaintiff's claims against Defendants nonetheless fail, because Congress has granted Defendants official immunity from those claims. The only proper defendant in this case is therefore the United States, and Plaintiff's claims against the United States are barred because Plaintiff failed to exhaust administrative remedies as required by the FTCA.

We first address the question whether Defendants are entitled to immunity under the terms of the Westfall Act. We then address Plaintiff's argument that, even if the Westfall

---

[4] Because we resolve this case on the ground that Plaintiff failed to exhaust administrative remedies as required by the FTCA—a jurisdictional requirement under our caselaw, *Brady v. United States*, 211 F.3d 499, 502 (9th Cir. 2000)—we do not address any other threshold issues. *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 578 (1999) (holding that "there is no unyielding jurisdictional hierarchy").

Act purports to confer immunity on Defendants, immunity cannot attach because Plaintiff has alleged that Defendants violated a *jus cogens* norm of international law.[5]

## A. *Defendants' Official Immunity Under the Westfall Act*

"The concept of the immunity of government officers from personal liability springs from the same root considerations that generated the doctrine of sovereign immunity. While the latter doctrine—that the 'King can do no wrong'—did not protect all government officers from personal liability, the common law soon recognized the necessity of permitting officials to perform their official functions free from the threat of suits for personal liability." *Scheuer v. Rhodes*, 416 U.S. 232, 239 (1974), *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800 (1982). "[T]he scope of absolute official immunity afforded federal employees is a matter of federal law, to be formulated by the courts in the absence of legislative action by Congress." *Westfall v. Erwin*, 484 U.S. 292, 295 (1988) (internal quotation marks omitted), *superseded on other grounds by* Pub. L. No. 100-694, 102 Stat. 4563 (1988), codified at

---

[5] Plaintiff also contends that judicial estoppel should bar the United States and Defendants from arguing that Defendants are entitled to immunity, because the United States took a different position during the Nuremberg Trials following World War II. We are not persuaded. The immunity claimed by Defendants and the United States comes from the Westfall Act, which did not exist at the time of the Nuremberg Trials. Thus, even assuming that the current position of the United States were clearly inconsistent with the position taken at the Nuremberg Trials, the new position rests on an intervening change in law and therefore is not subject to judicial estoppel. *See Longaberger Co. v. Kolt*, 586 F.3d 459, 470 (6th Cir. 2009) (collecting cases), *abrogated on other grounds by Montanile v. Bd. of Trs. of Nat'l Elevator Indus. Health Benefit Plan*, 136 S. Ct. 651 (2016).

28 U.S.C. § 2679(d). "The purpose of such official immunity is not to protect an erring official, but to insulate the decisionmaking process from the harassment of prospective litigation." *Id.*

The Westfall Act,**[6]** which was enacted in response to the Supreme Court's decision in *Westfall*, "accords federal employees absolute immunity from common-law tort claims arising out of acts they undertake in the course of their official duties." *Osborn v. Haley*, 549 U.S. 225, 229 (2007). The immunity extends to both "negligent" and "wrongful" "act[s] or omission[s] of any employee . . . acting within the scope of his office or employment." 28 U.S.C. § 2679(b)(1). The Act does not set out a test to determine whether an employee was "acting within the scope of his office or employment"; rather, Congress intended that courts would apply "the principles of *respondeat superior* of the state in which the alleged tort occurred" in analyzing the scope-of-employment issue. *Pelletier v. Fed. Home Loan Bank of S.F.*, 968 F.2d 865, 876 (9th Cir. 1992). The same analysis was employed before passage of the Westfall Act to determine whether the United States could be liable for an employee's torts under the FTCA. *Id.* at 875–76.

The Westfall Act provides a procedure by which the federal government determines whether an employee is entitled to immunity. When a current or former federal employee is sued and the employee believes that he is entitled to official immunity, he is instructed to "deliver . . . all

---

**[6]** The Act is officially called the Federal Employees Liability Reform and Tort Compensation Act of 1988, but it is "commonly known as the Westfall Act." *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 419–20 (1995).

process served upon him . . . to his immediate supervisor" or other designated official, who then "furnish[es] copies of the pleadings and process therein to the United States attorney for the district embracing the place wherein the proceeding is brought, to the Attorney General, and to the head of his employing Federal agency." 28 U.S.C. § 2679(c). The Attorney General then determines whether "the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose." *Id.* § 2679(d)(1). If so, the Attorney General issues a "scope certification," which "transforms an action against an individual federal employee into one against the United States." *Hui v. Castaneda*, 559 U.S. 799, 810 (2010). The "United States shall be substituted as the party defendant," 28 U.S.C. § 2679(d)(1), and the employee is released from any liability: "The remedy against the United States . . . is exclusive of any other civil action or proceeding for money damages by reason of the same subject matter against the employee whose act or omission gave rise to the claim or against the estate of such employee. Any other civil action or proceeding for money damages arising out of or relating to the same subject matter against the employee or the employee's estate is precluded without regard to when the act or omission occurred." *Id.* § 2679(b)(1).

The Westfall Act does not provide immunity to an official from a suit "brought for a violation of the Constitution of the United States." *Id.* § 2679(b)(2)(A). That preserves claims against federal officers under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). *Hui*, 559 U.S. at 807. The Act also does not provide immunity from a suit "brought for a violation of a statute of the United States under which such action against an

individual is otherwise authorized." 28 U.S.C. § 2679(b)(2)(B). Neither exception applies here.

But Plaintiff argues that Defendants' actions were not taken within the scope of their employment and that, therefore, they are not entitled to immunity under the Westfall Act in the first place. Plaintiff's argument embraces two distinct theories. The first theory is that Defendants in this case acted outside the scope of their employment because they (1) started planning the attack on Iraq before they ever took office, (2) attacked Iraq out of personal motives, and (3) were not employed to instigate an unlawful war. The second theory is that the scope-of-employment inquiry under the Westfall Act must be conducted with an eye toward the United States' treaty obligations. That is, the statute should not be construed to allow an act to be deemed "official" when the United States has entered into treaties condemning that same act. We will address those two theories in turn, and we will then address Plaintiff's challenge to the district court's denial of her request for an evidentiary hearing concerning the scope certification.

### 1. *The Scope-of-Employment Test*

"The Attorney General's decision regarding scope of employment certification [under the Westfall Act] is conclusive unless challenged. Accordingly, the party seeking review bears the burden of presenting evidence and disproving the Attorney General's decision to grant or deny scope of employment certification by a preponderance of the evidence." *Green v. Hall*, 8 F.3d 695, 698 (9th Cir. 1993) (per curiam) (citation and footnote omitted). "To rebut the [scope] certification . . . , a plaintiff must 'allege sufficient facts that, taken as true, would establish that the defendant's

actions exceeded the scope of his employment.'" *Wuterich v. Murtha*, 562 F.3d 375, 381 (D.C. Cir. 2009) (brackets omitted) (quoting *Stokes v. Cross*, 327 F.3d 1210, 1215 (D.C. Cir. 2003)). "[W]here a plaintiff fails to allege sufficient facts to rebut the certification, the United States must be substituted as the defendant . . . ." *Id.*

As noted above, when determining whether a federal officer's actions fall within "the scope of his office or employment" for purposes of the Westfall Act, we apply "the principles of *respondeat superior* of the state in which the alleged tort occurred." *Pelletier*, 968 F.2d at 876. We agree with the parties that the *respondeat superior* law of the District of Columbia applies in this case.

District of Columbia courts routinely "look[] to the Restatement (Second) of Agency" in determining whether an employee's actions fall within the scope of employment. *Rasul v. Myers*, 512 F.3d 644, 655 (D.C. Cir. 2008) (internal quotation marks omitted), *vacated*, 555 U.S. 1083 (2008), *reinstated in relevant part*, 563 F.3d 527, 528–29 (D.C. Cir. 2009) (per curiam). "The Restatement provides [that]: '(1) Conduct of a servant is within the scope of employment if, but only if: (a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; (c) it is actuated, at least in part, by a purpose to serve the master[;] and (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master. (2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.'" *Council on Am. Islamic Relations v. Ballenger*, 444 F.3d 659, 663 (D.C. Cir. 2006) (per curiam) (quoting Restatement (Second)

of Agency § 228 (1958)).  "District of Columbia law liberally construes the doctrine of respondeat superior, at least with respect to the first prong of the Restatement." *Kashin v. Kent*, 457 F.3d 1033, 1039 (9th Cir. 2006) (ellipses omitted) (quoting *Stokes*, 327 F.3d at 1216).  "The test for scope of employment is an objective one, based on all the facts and circumstances."  *Ballenger*, 444 F.3d at 663 (brackets omitted) (quoting *Weinberg v. Johnson*, 518 A.2d 985, 991 (D.C. Cir. 1986)).

Plaintiff claims that Defendants (particularly Wolfowitz and Rumsfeld) were not acting within the scope of their employment in carrying out the Iraq War because they started planning the war before taking office.  There are at least two problems with this argument.  First, the alleged tortious acts of aggression—the invasion of Iraq—took place after Defendants occupied public office, and what took place in the late 1990s was not planning, but only advocacy.  During most of that time, neither Wolfowitz nor Rumsfeld could have known that he would soon be in a position to help implement his policy preferences.  Second, pre-employment statements of intent or belief do not take the later acts of public officials outside the scope of their employment.  Under Plaintiff's theory, every time a politician honors a campaign promise, she could be considered to be acting outside the scope of her employment.  Or, if a passionate advocate for voting rights were appointed to head the Civil Rights Division of the Department of Justice, his or her bringing a lawsuit to enforce voting rights would be viewed as outside the scope of his or her employment.

Plaintiff makes a similar argument with respect to Defendants' motives, which bear on the third prong of the Restatement test—whether an employee's actions were

"actuated, at least in part, by a purpose to serve the master." Plaintiff asserts that she has "alleged that Defendants were solely motivated by personal, selfish purposes," but that assertion is not borne out by the factual allegations in the second amended complaint. Plaintiff conflates a policy preference or worldview—which is "personal" in the sense that it may be deeply felt or tied to one's sense of morality or identity—that motivates one to advocate for certain positions, with a desire to serve one's individual interests. A federal official would act out of "personal" motives and not be "actuated . . . by a purpose to serve the master" if, for instance, he used the leverage of his office to benefit a spouse's business, paying no heed to the resulting damage to the public welfare. But that is not what Plaintiff has alleged. Rather, she has alleged that Defendants were committed to certain foreign policy objectives in which they believed. Even if those alleged objectives or beliefs were misguided or in contravention of international norms, the motives were not "personal" in the scope-of-employment sense; Defendants' conduct was "actuated, at least in part, by a purpose to serve the master," the United States. *Ballenger*, 444 F.3d at 663.

Finally, Plaintiff argues that Defendants "were not employed to execute a pre-existing war." But Defendants, as members of the executive branch, were charged broadly with guiding the United States' foreign policy and with ensuring national security. *Dep't of Navy v. Egan*, 484 U.S. 518, 529–30 (1988). And Congress authorized Defendant Bush "to use the Armed Forces of the United States as he determine[d] to be necessary and appropriate in order to . . . defend the national security of the United States against the continuing threat posed by Iraq." Authorization for Use of Military Force § 3(a). The actions that Defendants took in connection with the Iraq War were part of their official

duties, even if some Defendants had hoped to be able to take those actions years before taking office.

In summary, reading the Westfall Act in a straightforward manner and applying District of Columbia *respondeat superior* law to the facts alleged in the operative complaint, we hold that Defendants' alleged actions fell within the scope of their employment.

   2.  *Construing the Westfall Act With an Eye Toward Treaty Obligations*

Plaintiff next argues that the Westfall Act should not be interpreted so as to regard as "official" an act condemned by treaty.  Plaintiff cites as support for this proposition the United Kingdom case of *Regina v. Bartle & the Commissioner of Police for the Metropolis & Others ex parte Pinochet* (No. 3), [2000] 1 A.C. 147 (H.L.) (appeal taken from Q.B. Div'l Ct.) (U.K.), *reprinted in* 38 I.L.M. 581 (1999), in which the House of Lords ruled that former Chilean leader Augusto Pinochet was not entitled to official immunity for the role that he played in ordering acts of torture and other violations of international law.  Many of the Law Lords reasoned that Pinochet's acts could not be considered official because the Convention Against Torture[7] forbade such acts, and Chile was a party to that treaty. 38 I.L.M. at 595 (opinion of Lord Browne-Wilkinson); *id.* at 626–27 (opinion of Lord Hope); *id.* at 638–39 (opinion of Lord Hutton); *id.* at 642–43 (opinion of Lord Saville).  The United States has signed several treaties and other

---

   [7] United Nations Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85.

international agreements condemning aggressive war,[8] and Plaintiff argues that interpreting the Westfall Act to allow for immunity in this case would conflict with those agreements.

This argument suffers from at least two fatal flaws. First, the equivalent of the "scope of employment" test in the *Pinochet* case was a creature of *international* law, not a test set out by a *domestic* statute. The Law Lords were tasked with determining whether Pinochet's actions could be considered "official" as a matter of international law. The effect of a treaty on that international-law analysis has little bearing on that same treaty's effect on the scope-of-employment analysis under domestic law.

Second, although we have suggested that ambiguous statutes should be interpreted to avoid conflicts even with non-self-executing treaties,[9] *Kim Ho Ma v. Ashcroft*, 257 F.3d

---

[8] Plaintiff cites the following treaties and agreements: the United Nations Charter, June 26, 1945, 59 Stat. 1031, T.S. No. 993; the Agreement for the Prosecution and Punishment of the Major War Criminals of the European Axis and Charter of the International Military Tribunal, Aug. 8, 1945, 59 Stat. 1544, 82 U.N.T.S. 279 [London Charter]; the Charter of the International Military Tribunal for the Far East, Jan. 19, 1946, T.I.A.S. No. 1589; and the Kellogg-Briand Peace Pact, Aug. 27, 1998, 46 Stat. 2343, 94 L.N.T.S. 57.

[9] The proposition that statutes should be construed to avoid conflicts with non-self-executing treaties has been the subject of some debate by both courts and commentators. *See Fund for Animals, Inc. v. Kempthorne*, 472 F.3d 872, 879 (D.C. Cir. 2006) (Kavanaugh, J., concurring) (opining that "the canon against construing an ambiguous statute to abrogate a treaty . . . should not apply in cases involving non-self-executing treaties"); *see also* Rebecca Crootof, Note, *Judicious Influence: Non-Self-Executing Treaties and the Charming Betsy Canon*, 120 Yale L.J. 1784, 1790–91 (2011) (arguing that ambiguous statutes should be read to avoid conflicts with non-self-executing treaties). By contrast, there is no doubt

1095, 1114 (9th Cir. 2001), the Westfall Act is not, in any relevant way, ambiguous. With the Westfall Act—which was enacted after the passage of each of the treaties and agreements to which Plaintiff cites—Congress clearly intended to grant federal officers immunity to the same extent that the United States would have been liable for those employees' tortious acts under the FTCA (subject to exceptions that are not relevant to today's analysis). *Pelletier*, 968 F.2d at 876. When the Westfall Act was passed, it was clear that this immunity covered even heinous acts. *See, e.g.*, *Hoston v. Silbert*, 681 F.2d 876, 877–80 (D.C. Cir. 1982) (per curiam) (holding that United States Marshals were acting in the scope of their employment when they allegedly beat an unarmed, shackled prisoner and left him to die in a holding cell).

In short, the treaties and charters cited by Plaintiff do not alter our conclusion that the Westfall Act, by its plain terms, immunizes Defendants from suit.

### 3. *Denial of an Evidentiary Hearing*

Plaintiff next argues that she should have been afforded an opportunity to challenge the scope certification at an evidentiary hearing. But because the allegations in the operative complaint, taken as true, do not establish that Defendants acted outside the scope of their employment, an

---

that when a *self-executing* treaty and a statute "relate to the same subject, the courts will always endeavor to construe them so as to give effect to both, if that can be done without violating the language of either." *Whitney v. Robertson*, 124 U.S. 190, 194 (1888).

evidentiary hearing would be a futile exercise.[10]  *See McLachlan*, 261 F.3d at 910–11 (finding no abuse of discretion in district court's denial of hearing to challenge scope certification "because[,] even viewing the evidence in the light most favorable to [the plaintiff] and accepting his version of events, dismissal was appropriate"); *see also Wuterich*, 562 F.3d at 381 (holding that a plaintiff "may, if necessary, attain 'limited discovery' to resolve any factual disputes over" the scope-of-employment issue, but *only if* he or she "alleg[es] sufficient facts that, taken as true, would establish that the defendant's actions exceeded the scope of [his or her] employment" (brackets omitted) (quoting *Stokes*, 327 F.3d at 1214–15)).  Accordingly, the district court did not abuse its discretion in denying Plaintiff an evidentiary hearing to challenge the scope certification.[11]

B.  *Jus Cogens Violations and Domestic Official Immunity*

Finally, Plaintiff argues that Defendants cannot be immune under the Westfall Act because she alleges violations of a *jus cogens* norm of international law.  "[A] *jus cogens* norm, also known as a 'peremptory norm' of international law, 'is a norm accepted and recognized by the international community of states as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character.'"  *Siderman de Blake v. Argentina*, 965 F.2d 699,

---

[10] Plaintiff did not seek leave to amend the complaint for a third time.

[11] Plaintiff also argues that she was entitled to a jury determination of the correctness of the scope certification.  But a judge, not a jury, is the "appropriate trier of any facts essential to certification." *Osborn*, 549 U.S. at 252.

714 (9th Cir. 1992) (quoting Vienna Convention on the Law of Treaties art. 53, May 23, 1969, 1155 U.N.T.S. 332). "Whereas customary international law derives solely from the consent of states, the fundamental and universal norms constituting *jus cogens* transcend such consent." *Id.* at 715. "Because *jus cogens* norms do not depend solely on the consent of states for their binding force, they enjoy the highest status within international law." *Id.* (internal quotation marks omitted). "International law does not recognize an act that violates *jus cogens* as a sovereign act." *Id.* at 718.

Plaintiff contends that Congress simply cannot immunize a federal official from liability for a *jus cogens* violation. In effect, Plaintiff argues that (1) there is a *jus cogens* norm prohibiting the provision of immunity to officials alleged to have committed *jus cogens* violations[12] and, (2) insofar as the Westfall Act violates that norm, it is invalid. The argument is premised on the idea that "[i]nternational law does not recognize an act that violates *jus cogens* as a sovereign act," so that an official who is alleged to have engaged in such an act cannot cloak himself in the immunity of the sovereign. *Siderman de Blake*, 965 F.2d at 718.

We assume, without deciding, that the prohibition against aggression is a *jus cogens* norm.[13] But even assuming that the

---

[12] Or, alternatively, Plaintiff contends that there is a prohibition on defining an official's scope of employment under domestic law to include actions that violate *jus cogens* norms.

[13] *See, e.g.*, Evan J. Criddle & Evan Fox-Decent, *A Fiduciary Theory of Jus Cogens*, 34 Yale J. Int'l L. 331, 333 (2009) (describing the prohibition on aggression as a "recognized peremptory norm[]").

prohibition against aggression is a *jus cogens* norm, Plaintiff's argument that Congress cannot provide immunity to federal officers in courts of the United States for violations of that norm is in serious tension with our caselaw. In *Siderman de Blake*, we held that Congress could grant a foreign government immunity from suit for alleged violations of the *jus cogens* norm against torture. *Id.* at 718–19. After recognizing that immunity might not be available as a matter of customary international law, we noted that we were dealing "not only with customary international law, but with an affirmative Act of Congress"—in that case, the Foreign Sovereign Immunities Act. *Id.* at 718.

*Siderman de Blake* dealt with foreign sovereign immunity, whereas this case concerns the official immunity of domestic officers. But, if anything, that difference cuts against Plaintiff. The immunity of foreign officials in our courts flows from different considerations than does the immunity of domestic officials. *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 207 n.5 (D.C. Cir. 1985); *accord Universal Consol. Cos. v. Bank of China*, 35 F.3d 243, 245 (6th Cir. 1994) ("[D]omestic sovereign immunity and foreign sovereign immunity are two separate concepts, the first based in constitutional law and the second in customary international law."). Given those different origins, it should be easier for the violation of a *jus cogens* norm to override foreign sovereign immunity than domestic official immunity. Therefore, our holding in *Siderman de Blake*—that Congress can provide immunity to a foreign government for its *jus cogens* violations, even when such immunity is inconsistent with principles of international law—compels the conclusion

that Congress also can provide immunity for federal officers for *jus cogens* violations.[14]

## CONCLUSION

Defendants are entitled to immunity under the Westfall Act.  Accordingly, the United States was properly substituted as the sole defendant.  Because Plaintiff did not exhaust her administrative remedies against the United States, the district court properly dismissed the case for lack of subject matter jurisdiction.

**AFFIRMED.**

---

[14] *Siderman de Blake* also forecloses the alternative formulation of Plaintiff's argument—that an official's scope of employment under domestic law cannot include actions that violate *jus cogens* norms.  We held in *Siderman de Blake* that actions violating *jus cogens* norms, although not recognized as sovereign acts under international law, could constitute sovereign acts for purposes of the Foreign Sovereign Immunities Act.  965 F.2d at 718–19.  Similarly, Defendants' alleged violations of a *jus cogens* norm can be considered to be within the scope of their employment as a matter of domestic law.