# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued March 17, 2006        Decided April 11, 2006

No. 05-5161

COUNCIL ON AMERICAN ISLAMIC RELATIONS,
APPELLANT

v.

CASS BALLENGER,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 03cv02488)

*Jeremiah A. Denton, III* argued the cause for appellant. With him on the briefs was *Michael C. Zisa*.

*Peter D. Blumberg*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Kenneth L. Wainstein*, U.S. Attorney, and *Michael J. Ryan*, Assistant U.S. Attorney. *R. Craig Lawrence*, Assistant U.S. Attorney, entered an appearance.

Before: SENTELLE, ROGERS and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed PER CURIAM.

*PER CURIAM*: In this defamation action, we consider whether a congressman acted "within the scope of employment" when he discussed his marital status in his office, during regular business hours, in response to a reporter's inquiries. The District Court held that he did, and we agree. We therefore affirm the District Court's conversion of the case into an action against the United States pursuant to the procedures set forth in the Federal Employees Liability Reform and Tort Compensation Act of 1988 ("Westfall Act"), 28 U.S.C. § 2679, and its dismissal of the suit for lack of subject matter jurisdiction because the United States has not waived its sovereign immunity. *See id.* § 2680(h).

## I. Factual Background

Cass Ballenger served as United States Representative for North Carolina's Tenth Congressional District from 1986 to 2005. In August 2003, the *Charlotte Observer*, a newspaper of wide circulation in Ballenger's district, profiled Ballenger in an article describing his background, interests, and legislative stances. The piece made no mention, however, of Ballenger's recent separation from his wife. After the article was published, a reader contacted its author, one Tim Funk, to ask why it was silent on Ballenger's marital status. Believing that at least some of his readership was interested in the separation, Funk decided to address it when he next wrote a story on Ballenger.

That opportunity arose about a month later. On September 30, 2003, Funk contacted Ballenger's office seeking information for a new article to be published the following week. Ballenger was unavailable, so his chief of staff, Dan Gurley, fielded the call. The conversation lasted about thirty minutes, taking place during regular business hours while Gurley was working in Ballenger's office suite on Capitol Hill. It focused on legislative issues—particularly trade and textiles—that were of interest to Congressman Ballenger and his

constituents. Near the end of the interview, Funk asked about Ballenger's separation from his wife. Gurley confirmed that the separation had occurred, adding that it was amicable.

After the interview, Gurley related the substance of the conversation to Ballenger, who decided to follow up with Funk "for the following reasons":

> I pride [myself] on my reputation in my district as a straight-talking businessman rather than a politician, and I was acutely aware that my ability to continue advancing my legislative agenda in Congress and to effectively represent my district depended on the continued trust and respect of my constituents. I also knew that reports about my marital status would be of concern in my socially conservative district. Moreover, as a veteran member of the House, I was acutely aware that a public scandal related to my marital status could undercut my ability to carry out these responsibilities, both in the near-term and in the long-term if it were to become an issue in a future re-election campaign. (At that time, I had not yet determined whether I would seek reelection in November 2004 . . . .) In short, I determined to clarify with Mr. Funk the state of my family situation in order to defuse an issue that could affect my representational responsibilities to my district and/or inhibit my long-term ability to continue advancing my legislative agenda in Congress.

App. 23-24.

With these objectives in mind, Ballenger called Funk from his congressional office during regular business hours on October 1, 2003. During the fifteen-minute conversation, Ballenger elaborated on the reasons why he and his wife had separated, chief among them being his wife's dissatisfaction

with life in Washington, D.C. In particular, Ballenger explained that his wife became increasingly uncomfortable living across the street from the headquarters of the Council on American-Islamic Relations ("CAIR") after the September 11th attacks. During the course of this explanation, Ballenger stated that CAIR was the "fund-raising arm for Hezbollah." The United States Department of State has designated Hezbollah a foreign terrorist organization pursuant to 8 U.S.C. § 1189.

Ballenger's comment was republished in newspapers and electronically throughout the United States. CAIR, a nonprofit NGO whose stated goal is to promote a positive image of Islam in the United States and empower the American Muslim community, sued Ballenger for defamation and slander about two months later.

## II.  Legal Background

### A.  The Westfall Act

In *Westfall v. Erwin*, the Supreme Court held that federal officials are generally immune from state tort lawsuits for money damages if their conduct was both within the scope of employment and discretionary in nature. 484 U.S. 292, 299 (1988). Congress apparently deemed this standard too exacting. It swiftly enacted the Westfall Act, which eliminates *Westfall*'s "discretionary" requirement and prescribes "that federal employees' immunity from state tort lawsuits for money damages hinges exclusively on whether they were acting within the scope of employment during the alleged incident." *Haddon v. United States*, 68 F.3d 1420, 1422-23 (D.C. Cir. 1995). In pertinent part, the Act provides:

> Upon certification by the Attorney General that the defendant employee *was acting within the scope of his office or employment at the time of the incident out of which the claim arose*, any civil action or proceeding commenced upon such claim in a United States district court shall be deemed an action against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant.

28 U.S.C. § 2679(d)(1) (emphasis added).

"[T]he Attorney General's certification that a federal employee was acting within the scope of his employment . . . does not conclusively establish as correct the substitution of the United States as defendant in place of the employee." *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 434 (1995). But it does constitute *prima facie* evidence that the employee was acting within the scope of his employment. *See Kimbro v. Velten*, 30 F.3d 1501, 1509 (D.C. Cir. 1994). "[A] plaintiff challenging the government's scope-of-employment certification bears the burden of coming forward with specific facts rebutting the certification." *Stokes v. Cross*, 327 F.3d 1210, 1214 (D.C. Cir. 2003) (internal quotation marks and citation omitted). Once a court determines that the federal employee acted within the scope of employment, the case is, *inter alia*, restyled as an action against the United States that is governed by the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-2680. *See Haddon*, 68 F.3d at 1423.

## B. D.C. Scope-of-Employment Law

Under the Westfall Act, courts apply the *respondeat superior* law in the state in which the alleged tort occurred. *See Stokes*, 327 F.3d at 1214. District of Columbia law, which applies in this case, follows the RESTATEMENT (SECOND) OF

AGENCY (1958) ("Restatement") in defining scope of employment. *Moseley v. Second New St. Paul Baptist Church*, 534 A.2d 346, 348 n.4 (D.C. 1987). The Restatement provides:

> (1) Conduct of a servant is within the scope of employment if, but only if:
>> (a) it is of the kind he is employed to perform;
>> (b) it occurs substantially within the authorized time and space limits;
>> (c) it is actuated, at least in part, by a purpose to serve the master, and
>> (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.
>
> (2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

Restatement § 228. "[T]he test for scope of employment is an objective one, based on all the facts and circumstances." *Weinberg v. Johnson*, 518 A.2d 985, 991 (D.C. 1986) ("*Weinberg*"). Although scope of employment is generally a question for the jury, it "becomes a question of law for the court, however, if there is not sufficient evidence from which a reasonable juror could conclude that the action was within the scope of the employment." *Boykin v. District of Columbia*, 484 A.2d 560, 562 (D.C. 1984) (collecting cases).

Because CAIR does not dispute that Ballenger made the statement in question while in his office during work hours—if indeed there are such limitations on a Representative's work—and because there are no allegations of force, only the first and third of section 228(1)'s elements are at issue in this

case. Consistent with the Restatement's use of the conjunctive, both remaining prongs must favor Ballenger if we are to find that he acted within the scope of employment. *See Haddon* 68 F.3d at 1424 (citations omitted).

### III. The District Court's Decision

CAIR sued Congressman Ballenger for defamation in the United States District Court for the District of Columbia on December 2, 2003. On February 5, 2004, Mark E. Nagel, then Civil Chief of the U.S. Attorney's Office for the District of Columbia, certified that Ballenger acted within the scope of his employment as an employee of the United States when he made the allegedly defamatory statement. *See* 28 U.S.C. § 2679(d); 28 C.F.R. § 15.3(a). Based on this certification, the United States moved to dismiss on the theory that its name should be substituted for Ballenger's and that the case should be dismissed as barred by sovereign immunity.

Both parties briefed the scope of employment issue and conducted limited discovery. On March 29, 2005, the District Court ruled that Ballenger was acting within the scope of his employment when he uttered the statement in question. "To say the least," the court wrote, "speaking to the press is a critical part of the expected and authorized conduct of a United States Congressman." Relying on Ballenger's affidavit, the court also found that he "was acting, at least in part, for the purpose of preserving his effectiveness" as a congressman. Accordingly, it upheld the Government's certification, concluding that the United States was properly substituted as a defendant and that the case should be dismissed for lack of jurisdiction because the United States had not waived sovereign immunity under the FTCA. CAIR filed this appeal.

8

## IV. Legal Analysis

CAIR argues that Ballenger's statement fell outside the scope of his employment because it was neither conduct "of the kind he is employed to perform," Restatement § 228(1)(a), nor was it "actuated, at least in part, by a purpose to serve the master," *id.* § 228(1)(c). The District Court's legal conclusion that Ballenger was acting within the scope of his employment is subject to *de novo* review. *See Hoston v. Silbert*, 681 F.2d 876, 879 (D.C. Cir. 1982).

Under section 228(1)(a), CAIR maintains that Ballenger's allegedly defamatory statement *itself* was not conduct of the kind he is employed to perform. This argument rests on a misunderstanding of D.C. scope-of-employment law (not to mention the plain text of the Westfall Act), which directs courts to look beyond alleged intentional torts themselves. The proper test has two disjunctive parts: "To qualify as conduct of the kind he was employed to perform, the [defendant's] actions must have either been 'of the same general nature as that authorized' or '*incidental to* the conduct authorized.'" *Haddon*, 68 F.3d at 1424 (quoting Restatement § 229) (emphasis added). CAIR's argument ignores the latter half of the test. If we accepted its position, numerous D.C. agency-law decisions would make no sense. *See, e.g.*, *Johnson v. Weinberg*, 434 A.2d 404, 409 (D.C. 1981) ("*Johnson*") (holding that a reasonable juror could find that a laundromat employee acted within scope of employment when he shot a customer during a dispute over missing shirts); *Lyon v. Carey*, 533 F.2d 649, 652 (D.C. Cir. 1976) (holding that jury reasonably found that a mattress deliveryman acted within scope of employment when he assaulted and raped a customer following a delivery-related dispute); *see also Brown v. Argenbright Sec., Inc.*, 782 A.2d 752, 758 (D.C. 2001) (rejecting as "too broad" a rule that sexual assaults are categorically outside the scope of employment).

The proper inquiry in this case "focuses on the underlying dispute or controversy, not on the nature of the tort, and is broad enough to embrace any intentional tort arising out of a dispute that was originally undertaken on the employer's behalf." *Weinberg*, 518 A.2d at 992 (citations and internal quotation marks omitted). Here, the "underlying dispute or controversy" was the phone call between Ballenger and Funk discussing the marital separation. The appropriate question, then, is whether that telephone conversation—not the allegedly defamatory sentence—was the kind of conduct Ballenger was employed to perform. *Cf. Haddon*, 68 F.3d at 1424-25 (the touchstone of § 228(1)'s first prong is whether "employees' intentional torts . . . arise directly from the performance of their authorized duties"); *accord Penn Cent. Transp. Co. v. Reddick*, 398 A.2d 27, 29-31 (D.C. 1979).

We hold that it was. Speaking to the press during regular work hours in response to a reporter's inquiry falls within the scope of a congressman's "authorized duties." *See, e.g.*, *Operation Rescue Nat'l v. United States*, 975 F. Supp. 92, 108-09 (D. Mass. 1997) (A senator's allegedly defamatory "response to questions posed by the media" immediately following a fundraiser falls within the scope of his employment.), *aff'd*, 147 F.3d 68, 71 (1st Cir. 1998). Cognizant that under D.C. law, this prong is "liberally construe[d]," *Stokes*, 327 F.3d at 1216 (citations omitted), we hold that Ballenger's allegedly defamatory statement was incidental to the kind of conduct he was employed to perform.

CAIR resists this conclusion on two grounds. First, it insists that Ballenger's statement was purely private, unrelated to any matter of public concern. The circumstances of the conversation belie this suggestion. The *Charlotte Observer* and at least some subset of Ballenger's constituents were interested

in the separation. Given this level of public interest, we find CAIR's absolutist view at odds with reality. Moreover, it is telling that Funk felt at liberty to ask Gurley—rather than Ballenger himself—about the marital separation.

CAIR also asserts that Ballenger's conversation was "simply too remote from any congressional duty" to fall within the scope of employment. CAIR would presumably have us limit a congressman's appropriate conduct to core legislative functions such as drafting and lobbying for legislation. We reject that view as far too cramped. "[T]he legislative duties of Members of Congress are not confined to those directly mentioned by statute or the Constitution. Besides participating in debates and voting on the Congressional floor, a primary obligation of a Member of Congress in a representative democracy is to serve and respond to his or her constituents." *Williams v. United States*, 71 F.3d 502, 507 (5th Cir. 1995) (holding that a congressman's allegedly defamatory remarks in an interview were within the scope of employment); *Chapman v. Rahall*, 399 F. Supp. 2d 711, 714 (W.D. Va. 2005) (A congressman's "remarks, made to the media to ensure his effectiveness as a legislator, can fairly and reasonably be deemed to be an ordinary and natural incident or attribute of his job as a legislator." (internal quotation marks and citations omitted)); *cf. United States v. Brewster*, 408 U.S. 501, 512 (1972) (describing as "entirely legitimate" a "wide range" of "activities other than purely legislative activities," including "'news letters' to constituents, news releases, and speeches delivered outside the Congress").

Turning to section 228(1)(c), CAIR claims that Ballenger's statement was not "actuated, even in part, to serve the master." As with the first prong, CAIR faces an uphill battle: The Restatement's text reveals that even a *partial* desire to serve the master is sufficient. Restatement § 228(1)(c). In his affidavit,

Ballenger proffered several reasons for discussing his separation. He wanted to maintain the "continued trust and respect of [his] constituents" in order to preserve his "ability to carry out [his legislative] responsibilities, both in the near-term and in the long-term." App. 23-24. Put another way, Ballenger followed up with Funk to "defuse an issue that could affect [his] representational responsibilities to [his] district and/or inhibit [his] long-term ability to continue advancing [his] legislative agenda in Congress." *Id.* at 24. We agree with the District Court that Ballenger's conduct was motivated—at least in part—by a legitimate desire to discharge his duty as a congressman. *See Rahall*, 399 F. Supp. 2d at 715 (A congressman's "remarks, made to the media to ensure his effectiveness as a legislator, can 'fairly and reasonably be deemed to be an ordinary and natural incident or attribute' of his job as a legislator." (citation omitted)).

A Member's ability to do his job as a legislator effectively is tied, as in this case, to the Member's relationship with the public and in particular his constituents and colleagues in the Congress. In other words, there was a clear nexus between the congressman answering a reporter's question about the congressman's personal life and the congressman's ability to carry out his representative responsibilities effectively. To that extent, "service in the United States Congress is not a job like any other." *United States v. Rostenkowski*, 59 F.3d 1291, 1312 (D.C. Cir. 1995).

Finally, CAIR protests that a holding in favor of Ballenger "would immunize many federal employees for any gratuitous slander in the context of statements of a purely personal nature." It does no such thing. This case, like every judicial decision, cannot be divorced from its facts. To be sure, it involves a statement by a congressman to the press. But our *ratio decidendi* necessarily depends on the context in which the

statement was made. *See* Karl Llewellyn, THE BRAMBLE BUSH 72-76 (Oceana Publications, 1981) (1930) (Those "who think that precedent produces or ever did produce a certainty that did not involve matters of judgment and of persuasion . . . simply do not know our system of precedent in which they live."). We lack the power to render an opinion on any case or controversy not properly before us.

Having determined that Ballenger acted within the scope of his employment when he made the remark in question, we hold that the proper defendant under the Westfall Act is the United States. Sovereign immunity bars suits against the United States absent an explicit and unequivocal waiver. *See Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 261 (1999). CAIR points to no such waiver, and we have not found one. *See* 28 U.S.C. § 2680(h) (excepting "[a]ny claim arising out of . . . libel [or] slander" from the scope of the federal government's waiver of sovereign immunity in the FTCA, *id.* § 1346(b)). Therefore, informed by the Westfall Act, we agree with the District Court that CAIR's case is barred by sovereign immunity.

## V. Conclusion

For the foregoing reasons, we affirm the District Court's dismissal of the complaint for lack of subject matter jurisdiction.

*So ordered.*