# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

―――

Submitted February 9, 2018　　　　Decided March 27, 2018

No. 17-5133

PATRICIA SMITH AND CHARLES WOODS,
APPELLANTS

v.

HILLARY RODHAM CLINTON AND UNITED STATES OF
AMERICA,
APPELLEES

―――

Appeal from the United States District Court
for the District of Columbia
(No. 1:16-cv-01606)

―――

*Larry E. Klayman* was on the briefs for appellants.

*David E. Kendall*, *Katherine M. Turner*, and *Amy Saharia*
were on the brief for appellee Hillary Rodham Clinton.

*Jessie K. Liu*, U.S. Attorney, U.S. Attorney's Office, and
*Mark B. Stern* and *Weili J. Shaw*, Attorneys, U.S. Department
of Justice, were on the brief for appellee United States of
America.

Before: ROGERS, MILLETT, and PILLARD, *Circuit Judges*

Opinion for the Court filed PER CURIAM.

PER CURIAM: Sean Smith and Tyrone Woods tragically perished in the September 11, 2012, attacks on United States facilities in Benghazi, Libya. Their parents, Patricia Smith and Charles Woods, sued former Secretary of State Hillary Rodham Clinton for common-law torts based on her use of a private email server in conducting State Department affairs while Secretary of State and public statements about the cause of the attacks she made in her personal capacity while a presidential candidate. They appeal the substitution of the United States as the defendant on the claims involving the email server and the dismissal of their complaint for lack of subject matter jurisdiction and failure to state a claim. We affirm.

**I.**

The genesis of this case is in Clinton's private meeting with Smith and Woods on September 14, 2012, in the wake of their sons' deaths. According to the complaint, Secretary Clinton "lied to [Smith and Woods] and told [them] that the Benghazi Attack was the result of [an] anti-Muslim YouTube video that had been posted online and that the creator of the video would be arrested." Compl. ¶ 19. An entry in Woods's daily journal for September 14, 2012, records that "[Woods] gave Hillary a hug and shook her hand, and she said [they] are going to have the film maker arrested who was responsible for the death of [his] son." *Id.* ¶ 20.

Four years after this meeting, Smith and Woods sued Clinton for wrongful death, negligence, defamation, false light, intentional infliction of emotional distress, and negligent infliction of emotional distress. Their tort claims stem in part from Clinton's use of a private email server while she was Secretary of State "to conduct official government business,

including but not limited to," Smith and Woods allege, "sending and receiving thousands of e-mails regarding matters of national security." *Id.* ¶ 9. This information allegedly included the "location of . . . government operations in Benghazi, Libya" and "was intercepted by foreign powers." *Id.* ¶ 15. The complaint further alleges that Islamic terrorists acquired this information and "used it to plan, orchestrate, and carry out the horrific and devastating attack on the American diplomatic compound in Benghazi, . . . resulting in the death of four Americans, including Sean Smith and Tyrone Woods." *Id.* ¶ 16. The remaining claims arise from four statements Clinton made in her personal capacity during the 2016 presidential campaign, in response to Smith and Woods's accusations that she lied to them during the September 14 meeting about the cause of the attack. They alleged that these statements defamed them by "either directly calling them liars, or [] strongly implying that they are liars." *Id.* ¶ 23. The complaint alleged:

*First*, on December 6, 2015, *ABC News*' George Stephanopoulos asked Clinton about the attack in Benghazi: "'Did you tell them it was about the film?'" *Id.* ¶ 23(a) (citation omitted). Clinton responded:

> No. You know, look I understand the continuing grief at the loss that parents experienced with the loss of these four brave Americans. And I did testify, as you know, for 11 hours. And I answered all of these questions. Now, I can't — I can't help it the people think there has to be something else there. I said very clearly there had been a terrorist group, uh, that had taken responsibility on Facebook, um, between the time that, uh, I – you know, when I talked to my daughter, that was the latest information; we were, uh, giving it credibility. And then we learned the next day it wasn't true. In fact, they retracted it. This was a

4

fast-moving series of events in the fog of war and I think most Americans understand that.

*Id.* (internal quotation marks and citation omitted).

*Second*, on December 30, 2015, in an editorial board meeting, *Conway Daily Sun* columnist Tom McLaughlin referred to Clinton's answer to Stephanopoulos and asked "'Somebody is lying.  Who is it?'"  *Id.* ¶ 23(b) (citation omitted).  Clinton responded: "'Not me, that's all I can tell you.'"  *Id.* (citation omitted).

*Third*, during the Democratic Presidential Primary Debate on March 9, 2016, "[w]hen asked about [] Smith's allegation that [] Clinton lied to her by blaming the Benghazi Attack on the YouTube video," Clinton responded, "'I feel a great deal of sympathy for the families of the four brave Americans that we lost at Benghazi, and I certainly can't even imagine the grief that she has for losing her son, but she's wrong.  She's absolutely wrong.'"  *Id.* ¶ 23(c) (citation omitted).

*Fourth*, in a July 31, 2016, interview with Chris Wallace of *Fox News Sunday*, Clinton said,

> Chris, my heart goes out to both of them.  Losing a child under any circumstances, especially in this case, two State Department employees, extraordinary men both of them, two CIA contractors gave their lives protecting our country, our values.  I understand the grief and the incredible sense of loss that can motivate that.  As other members of families who lost loved ones have said, that's not what they heard[.]  I don't hold any ill feeling for someone who in that moment may not fully recall everything that was or wasn't said.

*Id.* ¶ 23(d) (internal quotation marks and citation omitted).

The district court granted the United States' motion to substitute itself for Clinton under the Federal Employees Liability Reform and Tort Compensation Act ("Westfall Act"), 28 U.S.C. § 2679, for those claims involving Clinton's use of a private email server while Secretary of State. The district court then dismissed without prejudice the wrongful death, negligence, and intentional infliction of emotional distress counts against Clinton in her official capacity for lack of subject matter jurisdiction due to Smith and Woods's failure to exhaust their administrative remedy under the Federal Tort Claims Act, 28 U.S.C. § 2675(a). The district court also dismissed without prejudice the defamation, false light, and intentional infliction of emotional distress counts against Clinton in her personal capacity for failure to state plausible claims for relief. Smith and Woods voluntarily withdrew their claim for negligent infliction of emotional distress.

## II.

Smith and Woods appeal the Westfall Act substitution of the United States for Clinton and the dismissal of the remaining tort claims. Our review is *de novo*. *Council on Am. Islamic Rel. v. Ballenger*, 444 F.3d 659, 664 (D.C. Cir. 2006) (*CAIR*); *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 623 (D.C. Cir. 2001).

## A.

The Justice Department certified that, "with respect to the incidents alleged in the Complaint, . . . Clinton was acting within the scope of her office as the Secretary of State of the United States at the time of the alleged conduct that purportedly occurred while she was in office, *i.e.*, from January 21, 2009 to

February 1, 2013." Westfall Certification at 2, No. 16-cv-1606, ECF. No. 23-1 (Oct. 21, 2016). That certification is *prima facie* evidence that any harm allegedly caused by Clinton's email communications was within the scope of her employment and thus that the United States was properly substituted. *CAIR*, 444 F.3d at 662. Smith and Woods bore the burden of alleging "specific facts" that could overcome that presumption. *Id.* (internal quotation marks and citation omitted); *see also Kimbro v. Velten*, 30 F.3d 1501, 1509 (D.C. Cir. 1994).

Smith and Woods contend that conducting official business on a private server could not have been within the scope of Clinton's employment as the Secretary of State because the Department of State's "general policy [is] that normal day-to-day operations be conducted on an authorized [Automated Information System]." Appellant Br. 24 (quoting Josh Gerstein, *Clinton Private Email Violated "Clear-Cut" State Dept. Rules*, POLITICO, Mar. 5, 2015) (second alteration in original). These allegations, even if true, fall well short of rebutting the United States' Westfall Certification.

Extensive precedent makes clear that alleging a federal employee violated policy or even laws in the course of her employment — including specific allegations of defamation or of potentially criminal activities — does not take that conduct outside the scope of employment. "The proper inquiry . . . 'focuses on the underlying dispute or controversy, not on the nature of the tort, and is broad enough to embrace any intentional tort arising out of a dispute that was originally undertaken on the employer's behalf.'" *CAIR*, 444 F.3d at 664 (D.C. Cir. 2006) (quoting *Weinberg v. Johnson*, 518 A.2d 985, 992 (D.C. 1986)). What matters is whether the underlying activity itself was part of the employee's duties. For instance, in *CAIR*, 444 F.3d at 664–665, the court held that because responding to media inquiries was one of the congressman's

authorized duties, such responses fell within the scope of employment even when defamatory. *See also, e.g.*, *Wuterich v. Murtha*, 562 F.3d 375, 384–85 (D.C. Cir. 2009) (congressman's media interviews about military incident, even if defamatory, were within scope of employment); *Rasul v. Myers*, 512 F.3d 644, 656–659 (D.C. Cir. 2008), *vacated and remanded on other grounds*, 555 U.S. 1083 (2008), *reinstated in relevant part*, 563 F.3d 527, 528–529 (D.C. Cir. 2009) (senior officials alleged to have implemented and supervised systemic torture of Guantanamo Bay detainees acted within the scope of their employment because their responsibilities included detaining and interrogating suspected enemy combatants); *Wilson v. Libby*, 535 F.3d 697, 712 (D.C. Cir. 2008) (Executive officials acted within their scope of employment when disclosing a covert operative's identity for retributive reasons while speaking to the press); *id.* at 712 n.2 (temporal and spatial scope of employment for important Executive officials not limited to regular working hours or government property).

Therefore, the parts of Count V — intentional infliction of emotional distress — dealing with Clinton's activities as Secretary of State were properly dismissed. The complaint challenges only Clinton's use of "her private e-mail server to send and receive confidential and classified government information, often concerning matters of national security" and "other government operations in Benghazi, Libya that the deceased were a part of." Compl. ¶ 50. Regardless of whether or not these activities were conducted properly or lawfully, those types of communications fall within the heartland of her duties as Secretary of State. *See Schneider v. Kissinger*, 412 F.3d 190, 194–95 (D.C. Cir. 2005) (foreign policy decisions committed to political branches). The same is true for Count I, wrongful death, which is based upon Clinton's use of "a private email server to send and receive secret, confidential and

classified government information," Compl. ¶ 26, and Count IV, negligence, premised on Clinton's "handling of confidential and classified government information via her personal email server," *id.* ¶ 44.

Because the district court properly granted the United States' motion to substitute itself for Clinton on Counts I, IV, V, and VI (now dismissed), those claims were then governed by the Federal Tort Claims Act, which requires exhaustion of administrative remedies before a lawsuit may be brought. 28 U.S.C. § 2675(a). Smith and Woods conceded that they failed to exhaust their administrative remedies. Pls' Opp'n to U.S. Mots. at 7, No. 16-cv-1606, ECF No. 30 (Nov. 18, 2016). The district court thus lacked subject matter jurisdiction over the Westfall Act covered claims. *McNeil v. United States*, 508 U.S. 106, 113 (1993).

**B.**

Even assuming the truth of the alleged falsity of Clinton's statements, the district court did not err in dismissing the remaining tort claims for defamation, false light, and intentional infliction of emotional distress (in relevant part) for failure to state a claim. Fed. R. Civ. P. 12(b)(6).

**1.** The district court correctly found that the defamation claim, Count II, does not state a plausible claim for relief. *Smith v. Clinton*, 253 F. Supp. 3d 222, 240–43 (D.D.C. 2017). A plaintiff claiming defamation must allege:

> (1) the defendant made a false and defamatory statement concerning the plaintiff; (2) the defendant published the statement without privilege to a third party; (3) the defendant's fault in publishing the statement amounted to at least negligence; and (4) either the statement was actionable as a matter of law

irrespective of special harm, or its publication caused the plaintiff special harm.

*Hourani v. Mirtchev*, 796 F.3d 1, 16 (D.C. Cir. 2015) (quoting *Oparaugo v. Watts*, 884 A.2d 63, 76 (D.C. 2005)) (internal quotation marks omitted).

Smith and Woods pled neither that Clinton's statements are actionable as a matter of law nor special damages. Federal Rule of Civil Procedure 9(g) requires that special damages "be specifically stated." The complaint merely contains a boilerplate recitation, unaccompanied by any factual detail, that "[a]s a direct and proximate result of Defendant Clinton's statements, [Smith and Woods] have suffered pecuniary damage, as well as injury to reputation, impairment to standing in their community, personal humiliation, pain and suffering, and emotional distress." Compl. ¶ 37. The affidavits of Smith and Woods allege the same harm, almost verbatim. *See* Woods Aff. ¶ 7; Smith Aff. ¶ 6.

They also did not plead that the challenged statements are defamatory as a matter law, a status reserved for statements about extreme subjects, such as criminal behavior, "serious sexual misconduct," "a loathsome disease," or a person's suitability for his chosen profession, *Carey v. Piphus*, 435 U.S. 247, 262 n.18 (1978); *see also Hall v. District of Columbia*, 867 F.3d 138, 149 (D.C. Cir. 2017). Clinton's statements are not of that character. In *Weyrich*, this court held that that an article claiming the plaintiff "'began to suffer bouts of pessimism and paranoia,'" though "unflattering," was not actionable. 235 F.3d at 624–25 (citation omitted). Similarly, even if Clinton's statements could be understood as casting Smith and Woods as liars, this unpleasant portrayal does not amount to defamation *per se*. Smith and Woods do not challenge these aspects of the district court's decision on

appeal, nor did they seek in district court to amend their complaint to provide the required specificity.

Even if Smith and Woods had adequately pled this element, their claim fails because Clinton's statements are not "'reasonably capable of any defamatory meaning,'" which is a question of law. *Id.* at 627 (quoting *White v. Fraternal Order of Police*, 909 F.2d 512, 518 (D.C. Cir. 1990)). "A statement is defamatory if it tends to injure plaintiff in his trade, profession or community standing, or lower him in the estimation of the community." *Id.* at 627 (internal quotation marks and citation omitted). "An allegedly defamatory remark must be more than unpleasant or offensive; the language must make the plaintiff appear odious, infamous, or ridiculous." *Id.* (internal quotation marks and citation omitted).

Clinton has made no such remarks here. In the *ABC News* interview, she contradicted Smith and Woods's version of events but did not state or imply they were lying, instead noting she "underst[ood] [their] continuing grief." Compl. ¶ 23(a). And in the *Conway Daily Sun* interview, it was the reporter, not Clinton, who posits someone is lying; all Clinton did was deny that she was lying. *Id.* ¶ 23(b). In the two subsequent interviews, Clinton bolstered her own version of events by noting that others present at the meeting supported her account and suggesting reasons why her recollection differed from that of Smith and Woods. *Id.* ¶ 23(c) and (d). Clinton did state that Ms. Smith was "absolutely wrong," *id.* ¶ 23(c), but disagreeing with another person's recollection does not necessarily imply that the other person is lying. The D.C. Court of Appeals has refrained from finding disagreement to constitute defamation even where the disagreement was combative, as in *Levant v. Whitley*, 755 A.2d 1036, 1040 (D.C. 2000), where the plaintiff was accused of "bringing shame" to the employer. The court reasoned that "[a]t most" the parties "had an intense

disagreement," which did "not rise to the level of defamation." *Id.* at 1046. Here, the facts of disagreement are less "intense" in the sense that Clinton does not accuse Smith and Woods of lying, and instead acknowledges their grief while respectfully disagreeing with their recollection. Because none of her responses stated or could be reasonably understood as implying that either Smith or Woods was lying, the claim fails.

**2.** The false light claim, Count III, also fails. "Because [defamation and false light] are so similar," a plaintiff may plead them as alternatives and a reviewing court "must also satisfy itself that the statement does not arguably place [the plaintiff] in a 'highly offensive' false light" in addition to finding the statements are not capable of defamatory meaning. *Weyrich*, 235 F.3d at 628. Because Clinton merely disagreed with Smith and Woods's recollection of events and couched this disagreement in sympathy, no reasonable person could conclude that Clinton's statements put Smith and Woods in a "highly offensive" false light.

**3.** With respect to the portion of Count V that survived the Westfall Act jurisdictional dismissal, the complaint is fatally deficient as to, at minimum, the first and third elements of an intentional infliction of emotional distress claim. Under District of Columbia law, "a plaintiff must show (1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." *Armstrong v. Thompson*, 80 A.3d 177, 189 (D.C. 2013) (internal quotation marks and citation omitted). As to the first element, "[t]he conduct must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Id.* (quoting *Drejza v. Vaccaro*, 650 A.2d 1308, 1312 n.10 (D.C. 1994)). None of Clinton's denials of allegations that she lied or her

remarks that Smith and Woods are incorrect comes close to meeting that strict standard. In fact, in *Weaver v. Grafio*, 595 A.2d 983, 985, 991 (D.C. 1991), the D.C. Court of Appeals held that the defendant's act of mailing his employers a copy of a letter to an ethics committee accusing them of a felony was not outrageous conduct. Here, Clinton did not explicitly accuse Smith and Woods of lying, let alone of committing a crime.

Likewise, as to the third prong, the complaint is silent as to how Smith's or Woods's emotional distress manifested itself. The complaint alleges that they suffered "severe emotional distress *stemming from the death of [their] sons*." Compl. ¶ 52 (emphasis added). But nothing in the factual allegations plausibly suggests that Clinton's statements, rather than the tragic deaths, triggered "emotional distress of so acute a nature that harmful physical consequences might not be unlikely to result." *Ortberg v. Goldman Sachs Grp.*, 64 A.3d 158, 164 (D.C. 2013) (internal quotation marks and citation omitted).

We affirm the order substituting the United States as a defendant and dismissing the claims for lack of subject matter jurisdiction or failure to state a claim.

*So ordered.*