# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 18, 2024          Decided August 5, 2025

No. 24-7013

IZTOK PLEVNIK,
APPELLANT

v.

EUGENE R. SULLIVAN, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:23-cv-00837)

———

*Bruce Fein* argued the cause and filed the briefs for appellant.

*Steven M. Cady* argued the cause for appellee Eugene Sullivan.  On the brief was Eugene Sullivan, pro se.

*Sean R. Janda*, Attorney, U.S. Department of Justice, argued the cause for appellee United States of America.  With him on the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, and *Mark B. Stern* and *Joshua M. Salzman*, Attorneys.

2

Before: SRINIVASAN, *Chief Judge*, WILKINS, *Circuit Judge*, and ROGERS, *Senior Circuit Judge*.

Opinion for the Court filed by *Chief Judge* SRINIVASAN.

SRINIVASAN, *Chief Judge*:  Not every search for fortune ends in riches.  That may be so, per the allegations in this case, even if the search finds the fortune.

Appellant Iztok Plevnik contends he discovered billions of dollars that had been taken from Libya and dispersed across Africa after the death of Muammar Gaddafi.  Plevnik, though, was never able to repatriate the funds to the United States.  He brought suit claiming he was the victim of a fraudulent plan by his lawyer and various federal employees to steal the money he had found and leave him stranded abroad.

The district court dismissed Plevnik's action in two stages.  First, with respect to his claim against his lawyer, the court held that Plevnik failed to identify any fraudulent misrepresentation on his lawyer's part.  Second, with respect to his claim against the federal defendants, the court allowed conversion of the claim into one against the federal government on the basis that the employees had been acting within the scope of their employment, and the court then dismissed the claim on grounds of the government's sovereign immunity.  We affirm the district court on both scores.

I.

A.

Because the district court dismissed Plevnik's suit as a matter of law, we assume the truth of the allegations in his complaint.  *See N'Jai v. U.S. Dep't of Educ.*, 111 F.4th 1288,

1290 (D.C. Cir. 2024). Those allegations tell a tale of considerable international intrigue.

Iztok Plevnik was born in Slovenia and later became a permanent resident of the United States. Plevnik has maintained a vibrant and varied career. At various points, he trained with the U.S. Navy Seals and the U.S. Secret Service, signed with the Miami Dolphins as a placekicker, and worked as a contractor for the International Criminal Court to facilitate prosecutions. Plevnik most recently worked as an independent contractor for international organizations, businesses, and individuals. That job presumably gave rise to the circumstances of this case.

Plevnik claims he discovered billions of dollars in cash that had been scattered across Africa following the death of Libyan President Muammar Gaddafi. Seeking assistance with repatriating the money to the United States, he contacted Eugene Sullivan, a lawyer in Washington, D.C. Sullivan took various actions in that connection. For instance, Sullivan secured signed letters from the General Counsel of the Treasury Department, which Plevnik claims authorized him to repatriate the funds via a wire transfer; and Sullivan represented Plevnik in an interview with Department of Justice attorneys concerning the site of the discovered funds.

The repatriation process proved far from smooth. In December 2020, Plevnik traveled to Kenya to arrange for the repatriation of $10 billion. Nairobi law enforcement refused to initiate a wire transfer without information authenticating the legitimacy of the repatriation. Plevnik called Sullivan in the early morning D.C. time and asked him to contact the State Department to confirm the legitimacy of the Treasury Department letters, but Sullivan refused given the early hour. Lacking any evidence that he was seeking to legitimately

repatriate funds, Plevnik returned to the United States empty handed.

In July 2021, Plevnik left for another repatriation trip, this time traveling to Abidjan, Côte d'Ivoire. He alleges he left at least $6 billion with the Abidjan police, then returned to the United States and told Sullivan about the funds in Abidjan. Sullivan advised that he would have the Department of Justice call the U.S. embassy in Abidjan to confirm the authenticity of the Department of Treasury letters. He also emailed James Billington—the security attaché at the U.S. embassy in Abidjan—to inform him that the Department of Treasury letters and Plevnik's repatriation of the funds were legitimate.

With that plan in place, Plevnik left again for Abidjan in August 2021. Once there, he met with Billington and provided the Treasury Department letters. Billington, however, was skeptical of Plevnik's endeavor and claimed the letters were counterfeit. Plevnik put Sullivan on the phone, who vouched for the authenticity of the letters and provided the names and numbers of the Treasury Department General Counsel and an attorney with the Department of Justice, Michael Keilty. Billington detained Plevnik for four hours while he unsuccessfully tried to contact the Treasury Department to confirm the authenticity of the letters. Plevnik contends that while he was detained, unknown individuals stole the money from the police station and replaced it with counterfeit cash.

Billington eventually allowed Plevnik to leave the embassy. The next morning, however, Abidjan police arrested Plevnik for allegedly laundering money and misrepresenting U.S. documents. An Ivoirian lawyer ultimately secured his release. When Plevnik returned to the United States, he met with Sullivan to discuss further attempts to repatriate the funds. While Sullivan initially said he would continue assisting with

the repatriation efforts, he later withdrew his representation because of the accusations of criminality against Plevnik.

B.

In March 2023, Plevnik brought this lawsuit alleging one count of fraud against two sets of defendants. The first set initially included Eugene Sullivan and his son, but Plevnik has since abandoned his claim against Sullivan's son. The second set consists of three federal employees Plevnik encountered in his repatriation efforts: Keilty, Billington, and Todd Brown, the then-Acting Assistant Secretary of State for Diplomatic Security. Plevnik alleged that all the defendants deceived him into thinking they would support him in the repatriation process when, in reality, they sought to discover the location of the funds, arrange for his demise in Côte d'Ivoire, and claim the money for themselves. The district court granted a dismissal to all the defendants.

As to Sullivan, the court explained that the complaint failed to allege any actionable misrepresentation by him. *Plevnik v. Sullivan*, 2024 WL 460786, at *1 (D.D.C. Jan. 26, 2024). Sullivan stated that he would serve as Plevnik's attorney, and Plevnik's own allegations in the complaint showed that Sullivan provided legal services to Plevnik in connection with his repatriation efforts. *Id.* at *4.

As to the federal employees, the United States substituted itself as defendant pursuant to the Westfall Act, 28 U.S.C. § 2679(d)(1), which enables the government to do so when federal workers are sued for actions taken within the scope of their employment. The district court held that Plevnik failed to rebut the Attorney General's certification that the employees were acting in the scope of their employment. *Plevnik v. Sullivan*, 2023 WL 7279229, at *1, *4 (D.D.C. Nov. 3, 2023). With the United States substituted as the defendant, the court

held that sovereign immunity barred the claim. *Id.* at \*5; *see* 28 U.S.C. § 2680(h), (k).

## II.

Plevnik's appeal seeks to overturn the dismissal of both his claim against Sullivan and his claim against the federal defendants. We reject his challenges.

## A.

Plevnik first contends that the district court erred in dismissing his fraud claim against his lawyer, Sullivan. According to Plevnik, regardless of any legal services Sullivan may have provided him, Sullivan acted fraudulently at the outset of forming a contract for legal representation by concealing his intent to steal Plevnik's repatriation money. That argument fails.

The parties agree that District of Columbia law governs Plevnik's fraud claim against Sullivan. Under District law, breach of a contractual promise can give rise to a fraudulent misrepresentation claim if, at the time of the contract's formation, the promisor had no intention to perform or knew performance would not occur. *See Bennett v. Kiggins*, 377 A.2d 57, 60–61 (D.C. 1977); *Va. Acad. of Clinical Psychs. v. Grp. Hospitalization & Med. Servs.*, 878 A. 2d 1226, 1234 (D.C. 2005). To succeed on such a claim, a plaintiff must "state[] with particularity" matters such as the "time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud." *United States ex rel. Williams v. Martin-Baker Aircraft*

*Co.*, 389 F.3d 1251, 1256 (D.C. Cir. 2004) (internal quotation marks and citation omitted).

Plevnik's complaint, however, fails to allege with particularity—or really at all—any misrepresentation. The complaint does contend that Sullivan agreed to represent Plevnik as his lawyer. *See* Am. Compl. ¶ 14, J.A. 12–13. But the complaint never alleges that Sullivan's statement in that regard was false, nor does it provide any facts showing that Sullivan entered into the representation without an intent to perform or with knowledge that performance would not occur.

To the contrary, the complaint describes actions showing not only that Sullivan intended to provide legal representation but that he did so. For instance, Sullivan "invariably represented himself as [Plevnik's] lawyer" in "email, text massages, or letters" he sent to third parties. *Id.* ¶ 14, J.A. 12–13. When Plevnik sought to initiate the repatriation process, Sullivan secured letters from the Treasury Department to facilitate the wire transfers. *Id.* ¶¶ 17–18, J.A. 13. Sullivan remained on call to provide advice during Plevnik's trip to Nairobi, and he verified Plevnik's credentials when Plevnik went to Côte d'Ivoire. *Id.* ¶¶ 20, 37, J.A. 14, 16–17. And Sullivan contacted Plevnik's wife to ensure Plevnik could find safe passage from Côte d'Ivoire after his detention there. *Id.* ¶ 39, J.A. 17.

To be sure, Plevnik's complaint alleges that Sullivan acted with a fraudulent intent in the course of the representation. For example, Plevnik claims that Sullivan arranged an interview with the Department of Justice merely "to induce [Plevnik] to disclose the whereabouts of the 6 billion or more dollars." Am. Compl. ¶ 16, J.A. 13. Plevnik further alleges that Sullivan worked to obtain letters from the Treasury Department "with

the specific intent of deceiving [Plevnik] into disclosing the whereabouts of the funds to be repatriated." *Id.* ¶ 17, J.A. 13.

The applicable pleading standard, however, requires more than mere "labels and conclusions" about Sullivan's intent. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). At any rate, the allegations concern Sullivan's post-agreement actions as Plevnik's lawyer, not actions indicating that Sullivan lacked any intent to perform when initially entering into the lawyer-client relationship. Sullivan's alleged actions as Plevnik's lawyer might show a breach of the duties of honesty and loyalty, potentially supporting a claim of breach of contract. *See O'Neil v. Bergan*, 452 A.2d 337, 341–43 (D.C. 1982). But a common law fraud claim must stand on its own, distinct from damages flowing from a contractual claim. *See Choharis v. State Farm Fire and Cas. Co.*, 961 A.2d 1080, 1089 (D.C. 2008). Here, Sullivan would have no duty of honesty or loyalty if not for the existence of a contractual relationship in the first place. In that context, any alleged breach of duty is not actionable as fraud.

As a final note, Plevnik asserts that the district court should have granted him leave to amend his complaint to clarify his fraud claim against Sullivan. But as we have explained, "[w]hen a plaintiff fails to seek leave from the District Court to amend [his] complaint, either before or after [his] complaint is dismissed, [he] forfeits the right to seek leave to amend on appeal." *City of Harper Woods Emps.' Ret. Sys. v. Olver*, 589 F.3d 1292, 1304 (D.C. Cir. 2009). Plevnik does not contend that he sought leave from the district court. We thus have no

ground for setting aside the district court's dismissal of Plevnik's fraud claim against Sullivan.

B.

Plevnik challenges the dismissal of his fraud claim against the federal employees on one ground:  that the district court erred in substituting the United States as defendant, which in turn enabled a dismissal based on the government's sovereign immunity.  We review de novo the district court's conclusion that the United States was properly substituted as defendant. *See Jacobs v. Vrobel*, 724 F.3d 217, 220 (D.C. Cir. 2013).

Under the Westfall Act, when a federal employee is sued in his individual capacity, the Attorney General or her delegee may certify "that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose."  28 U.S.C. § 2679(d)(1).  Upon the certification, the civil action "shall be deemed an action against the United States . . . and the United States shall be substituted as the party defendant." *Id.*  A Westfall certification "constitute[s] *prima facie* evidence that the employee was acting within the scope of his employment." *Council of Islamic Rels. v. Ballenger*, 444 F.3d 659, 662 (D.C. Cir. 2016) (per curiam).  To rebut the certification, a plaintiff must "alleg[e] sufficient facts that, taken as true, would establish that the defendant['s] actions exceed the scope of [his] employment." *Stokes v. Cross*, 327 F.3d 1210, 1215 (D.C. Cir. 2003).

A court reviewing a Westfall certification "appli[es] the respondeat superior law in the state in which the alleged tort occurred" to determine whether the government employee acted within the scope of his employment. *Ballenger*, 444 F.3d at 663.  The parties here do not dispute that District of Columbia law governs the inquiry.  The District of Columbia Court of Appeals, sitting en banc, recently clarified the

District's respondeat superior law in *Trump v. Carroll*, 292 A.3d 220 (D.C. 2023).

As the court there explained, the District "generally adheres to the analytical framework of the scope of employment inquiry set forth in the Restatement (Second) of Agency." *Id.* at 228. Under that framework, an employee's conduct falls within the scope of employment if "(a) it is of the kind [the person] is employed to perform; (b) it occurs substantially within the authorized time and space limits; [and] (c) it is actuated, at least in part, by a purpose to serve the [employer]." *Id.* at 228 (first alteration in original) (quoting *Restatement (Second) of Agency* § 228 (1958)).

Plevnik grounds his challenge to the government's Westfall certification in the framework's third prong. According to Plevnik, the government did not demonstrate that the federal defendants were actuated by a purpose to serve the United States when taking the actions giving rise to his fraud claim against them. We disagree.

The District of Columbia Court of Appeals explained that the third prong of its respondeat superior analysis—whether an action "is actuated, at least in part, by a purpose to serve the employer"—itself consists of three elements. The first is the "purpose" element, which requires that the employee have been "actuated . . . by a purpose to serve the [employer]." *Id.* 233–34. The second is the "quantum" element, which provides that "the employee need only have been actuated 'at least in part' by that purpose." *Id.* at 234. And the last is the "timing" element, which assesses "the temporal scope of circumstances . . . to discern the employee's purpose in acting." *Id.* at 237.

*First*, the "purpose" element is satisfied here. Determining "whether the employee was, in fact, motivated by a purpose to

serve their employer" is an inquiry into the employee's "subjective state of mind," guided by "inferences about whether the employee was in fact responding to an employment-related circumstance." *Id.* at 234–35. Here, the conduct at issue involved federal employees carrying out duties directly within the parameters of their employment. Keilty interviewed Plevnik to facilitate the government's obligation to help recover assets from abroad. Billington fulfilled his role as security attaché by detaining and questioning an individual who raised suspicions of fraudulent activity. And Brown carried out his role as a senior officer in charge of diplomatic security by supervising Billington.

Plevnik counters that fraud necessarily falls outside of employment activities. But courts must "look beyond alleged intentional torts themselves" and "focus[] on the underlying dispute or controversy" to determine whether conduct occurred in the scope of employment. *Ballenger*, 444 F.3d at 664 (internal quotation marks and citation omitted); *see also Carroll*, 292 A.3d at 235 ("[W]ere the inquiry limited to the tortious conduct itself without the underlying context, the characteristics of that conduct might misleadingly appear to be personal in nature."). Here, the underlying conduct involved federal employees acting squarely in their official capacities.

*Second*, for purposes of the "quantum" element, those employees were motivated "at least in part" to serve their employer. *Carroll*, 292 A.3d at 235. That could be so even if they were "concurrently motivated by a personal purpose" or if "such a personal purpose" was their "predominant purpose." *Id.* at 235–36. There is no dispute that each employee's pertinent conduct fell within his normal responsibilities: recovering U.S. financial assets, facilitating entry into a U.S. embassy, and detaining persons suspected of presenting fraudulent government documents. Plevnik stresses that,

according to his allegations, the employees acted to enrich themselves. But the question is whether they had at least "some discernable purpose" to serve the United States. *Id.* at 235. And the focus again is on the underlying context of the conduct, not just on its allegedly tortious nature. *See id.*

*Third*, and relatedly, an employee "need not possess the requisite purpose to serve the employer at the precise moment of time in which the tort was committed." *Id.* at 237. "Examining only the split second moment of the actual commission of the tort—absent some context—could unfairly limit employer liability." *Id.* at 238. Here, the employees were acting "within working hours and at an authorized place." *Id.* at 238 n.21 (internal quotation marks and citation omitted). Keilty was one of many Department of Justice attorneys called in to interview Plevnik to vet his proposal to extract billions of dollars located in foreign countries. And Billington and Brown facilitated Plevnik's entry to (and eventual detention at) a U.S. embassy in connection with Plevnik's repatriation efforts. Regardless of any personal motivations that allegedly drove the federal defendants to engage in tortious activity, "there was an employer-related impetus to the employee[s'] conduct at one time" given the nature of the duties performed. *Id.* at 238.

Plevnik last argues that the district court at least should have allowed him jurisdictional discovery to probe the federal defendants' motives before accepting the Westfall certification. But "there is no right to even limited discovery in a Westfall Act case unless and until a plaintiff alleges sufficient facts to rebut the Government's certification." *Wuterich v. Murtha*, 562 F.3d 375, 382 (D.C. Cir. 2009). That bar for discovery is high, in part, because the "Westfall Act confers absolute, not merely qualified, immunity upon federal employees acting within the scope of their official duties." *Id.* And the immunity "entitles government officials not merely to

avoid standing trial, but also to avoid the burdens of such *pretrial* matters as discovery." *Id.* (internal quotation marks and citation omitted). Because Plevnik failed to allege sufficient facts to overcome the government's Westfall certification, he has no entitlement to jurisdictional discovery.

\* \* \* \* \*

For the foregoing reasons, we affirm the judgment of the district court.

*So ordered.*